United States Court of Appeals,

Eleventh Circuit.

No. 96-6247.

Harry MERRITT, Plaintiff-Appellant,

v.

DILLARD PAPER COMPANY, Defendant-Appellee.

Aug. 29, 1997.

Appeal from the United States District Court for the Northern District of Alabama. (No. CV-94-B-1606-S), Sharon Lovelace Blackburn, Judge.

Before CARNES, Circuit Judge, and HENDERSON and GIBSON[*], Senior Circuit Judges.

CARNES, Circuit Judge:

Congress enacted as part of Title VII an anti-retaliation provision that prohibits an employer from taking action against an employee, "because he has ... participated in any manner" in another employee's Title VII proceeding. 42 U.S.C. § 2000e-3(a). At least as we are required to view them at this stage, the facts are that another employee filed a Title VII lawsuit against the employer alleging sexual harassment, and the plaintiff-employee in the present case was fired because he gave deposition testimony in that other lawsuit which was unfavorable to the employer. Those facts would seem to describe a clear cut violation of the anti-retaliation provision, but there is a twist.

The twist is that the plaintiff-employee in this case who was fired for giving the deposition testimony in the other lawsuit was himself one of the sexual harassers, he was opposed to the position of the Title VII plaintiff in the lawsuit in which he gave the deposition testimony, and he did not testify voluntarily. The district court held that these unusual facts took this case outside the scope of the anti-retaliation provision. Faced with the broad and unequivocal language of that provision, we disagree.

## I. FACTS AND PROCEDURAL HISTORY

---

[*]Honorable Floyd R. Gibson, Senior U.S. Circuit Judge for the Eighth Circuit, sitting by designation.

"In reviewing a grant of summary judgment, we view all the evidence in the light most favorable to the party opposing the motion," *Harris v. H & W Contracting Co.,* 102 F.3d 516, 518 (11th Cir.1996), in this case Merritt. The "actual" facts, as nearly as our system of justice can determine them, will be decided at trial. For that reason, "what we state as "facts' in this opinion for purposes of reviewing the ruling[ ] on the summary judgment motion[ ] may not be the actual facts." *Swint v. City of Wadley,* 51 F.3d 988, 992 (11th Cir.1995). "They are, however, the facts for the present purposes, and we set them out below." *Id.*

Harry Merritt worked as a sales representative at Dillard Paper Company's Birmingham office. By all accounts, the atmosphere of the workplace was not entirely professional and sometimes was downright crude. Employees, both male and female, told off-color jokes and made sexually explicit comments. Banter among employees included profanity, sexual propositions, and comments on sexual prowess. Sexually suggestive cartoons and sexually explicit articles circulated around the office. Merritt participated fully in those activities.

Approximately a year and a half after Janet Moore joined Dillard's Birmingham office as the receptionist, she began complaining to Roland Webb, the vice president and general manager of the Birmingham office, about what she perceived to be sexually harassing activity. Following several complaints from Moore, a meeting of all the men in the office was held in January 1991. Webb told them there had been complaints of sexual harassment in the office and that whoever was involved needed to clean up his act. Despite that warning, Merritt admits to making at least one sexually explicit comment after the meeting.

The month after the January 1991 meeting, Moore filed a charge with the EEOC alleging that she had been subjected to sexual harassment, and she subsequently initiated a Title VII lawsuit claiming hostile environment sexual harassment. Counsel for Dillard took Moore's deposition in that lawsuit in May 1992. In her deposition, Moore testified that five men—Webb, Merritt, and three other salesmen—engaged in a variety of sexually harassing activity, including telling off-color jokes, liberal use of profanity, sexual propositions, and inappropriate and unauthorized touching.

2

The five alleged harassers also were deposed. No subpoenas were issued to compel their appearance, but Dillard made the men available and told them when and where to show up for their depositions. Merritt's deposition was taken on June 25, 1992. In it Merritt said he could not remember many of the events Moore was complaining about, and he flatly denied that others had occurred. However, Moore admitted under oath some of the sexually harassing conduct of which Moore complained. He also described Moore as a willing participant in the office's bawdy atmosphere and expressed the opinion that her lawsuit was unfounded.

In January 1993, shortly before trial, Dillard and Moore reached a settlement. After the settlement, Dillard's president, Geoffry Clark, turned his attention to disciplining the five alleged harassers. In order to determine who to discipline and what discipline to impose, Clark read the deposition summaries of all the witnesses in the Moore case (with the exception of Moore's physicians). Clark did not conduct or rely upon any independent investigation of alleged harassment in the Birmingham office, nor did he talk to any of the employees in that office.

Clark decided that the five alleged harassers deserved different levels of discipline. Merritt was terminated. Webb, who had recently been transferred to a Dillard office in North Carolina, was terminated, also. One of the other salesmen was suspended for two weeks without pay and was denied an annual salary increase. The other two salesmen received reprimands.

Merritt was terminated on February 11, 1993, when Clark came to Dillard's Birmingham office to inform the four alleged harassers remaining there of his decisions. Clark met with Merritt and explained to Merritt that he was personally embarrassed over the case, and said that if the case had gone to trial, "we would have lost Dillard Paper Company." According to Merritt, Clark further stated: "Your deposition was the most damning to Dillard's case, and you no longer have a place here at Dillard Paper Company."

Following his termination, Merritt filed a charge with the EEOC, alleging that Dillard had retaliated against him because of the deposition testimony he gave in Moore's case. After receiving

3

his right-to-sue letter, Merritt initiated this lawsuit alleging violation of 42 U.S.C. § 2000e-3(a), the anti-retaliation provision of Title VII.

The district court granted summary judgment for Dillard based upon its holding that Title VII's anti-retaliation provision does not protect those who participate in another's case involuntarily and without any intent or desire to assist, as Merritt did in Moore's lawsuit. Alternatively, the court held that even if Merritt's participation in the deposition was protected activity, Dillard was nonetheless entitled to summary judgment. The court reasoned that there was no direct evidence of retaliatory motive, and that any prima facie case of retaliation had been met by Dillard's articulated non-retaliatory motive—firing a sexual harasser—which, the court thought, Merritt had failed to rebut. Merritt appealed.

## II. STANDARD OF REVIEW

We review a grant of summary judgment *de novo,* using the same legal standard as the district court. *See, e.g., Mayfield v. Patterson Pump Co.,* 101 F.3d 1371, 1374 (11th Cir.1996) (citation omitted).

## III. DISCUSSION

### A. THE SCOPE OF THE ANTI-RETALIATION PROVISION

The district court did not hold, and Dillard does not contend, that sexual harassers are *per se* excluded from the scope of 42 U.S.C. § 2000e-3(a), the anti-retaliation provision of Title VII. Instead, the district court stated: "It is entirely conceivable that the day will come when a discriminator or harasser crosses the line from denials with grudging admissions to willing disclosure and assistance and by doing so could be regarded as having participated "in the process of vindicating civil rights through Title VII.' " However, the district court held that, "[i]t could not rationally be concluded that this plaintiff participated in the process of vindicating Ms. Moore's civil rights," because he did not voluntarily participate, was personally opposed to her position in the lawsuit, and only reluctantly gave answers that were helpful to her side of the case.

4

An examination of the record bears out the district court's characterization of the nature of Merritt's participation in Moore's lawsuit. Merritt did nothing that assisted Moore in her lawsuit other than give the deposition. He never volunteered to be a witness for Ms. Moore, and he did not voluntarily attend the deposition and testify; his supervisor told him when and where to show up for it. As the district court observed, during Merritt's deposition he was essentially defending himself against Ms. Moore's claims that he was one of the employees who had sexually harassed her. In his deposition in the present case, Merritt stated that he was displeased that Dillard had settled with Ms. Moore, and gave his opinion that he had not violated Dillard's policy against sexual harassment.

In his deposition in Moore's case against Dillard, Merritt also testified that, in his opinion, Ms. Moore had not been sexually harassed. When asked in that deposition if he had made any statements concerning sexual organs or sexual acts to any of the female employees, Merritt first testified that the only thing he could remember saying was "scratch my nuts," which he admitted saying to Moore on a number of occasions. Moore's attorney had to engage in what the district court accurately characterized as "a significant amount of further inquiry" to elicit evidence of additional misconduct by Merritt. Despite Merritt's lack of candor and reluctance, Moore's attorney through further questioning did succeed in extracting from Merritt deposition testimony useful to Moore in proving her Title VII claim. The district court listed that testimony as follows:

> "Occasionally I'd say mark me out, bitch."
>
> In connection with a fishing trip, he told her "I guarantee you can come back with a red snapper."
>
> After talking with a customer on the telephone, he said to her, "Janet, he sure is taken with you, why don't you take care of him sometime."
>
> He probably has communicated jokes containing sexual content to female employees.
>
> He "shared" an article about oral sex with Gencie McCann.
>
> He possibly has made reference to a female employee's private parts directly to her.
>
> He made the statement to Gencie McCann "I had a dream about you last night and it was so good I feel I owe you money."

5

It is possible he said to Janet Moore in the presence of another person, "Janet, why don't you feel my nuts."

In answer to the question "Have you ever made the statement to Janet Moore, ooh, baby, I love it when you talk mean to me," he testified "That sounds like something I could have said." He probably has said that to other female employees also.

In answer to the question "Did you ever recently go into an office where Teresa Cummings was located and immediately close the door, then reopen the door and make the statement was it as good for you as it was for me, he replied, "Could have.' "

(Citations to deposition omitted) As is apparent from that listing, Merritt's deposition testimony provided building blocks Moore could use to construct a winning hostile environment case against Dillard. Indeed, the President of Dillard, who authorized the settlement of Moore's lawsuit, characterized Merritt's deposition testimony as "the most damning to Dillard's case."[1]

Therefore, what we have is a case of an employee who involuntarily participated in a Title VII proceeding by reluctantly giving deposition testimony which, in spite of his own personal wishes, assisted the claimant. We must decide whether that type of participation and testimony falls within the scope of the anti-retaliation provision, which provides:

It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a). This provision has two components, an opposition clause and a participation clause. *See Payne v. McLemore's Wholesale & Retail Stores,* 654 F.2d 1130, 1135 (5th Cir. Unit A Sept.1981). Merritt obviously can find no refuge under the opposition clause, because he did not oppose in any sense of the word the sexual harassment Moore suffered. To the contrary, he inflicted some of it. For that reason, Merritt relies solely on the participation clause, contending that he "testified ... or participated in any manner in an investigation, proceeding, or hearing."

---

[1]Merritt has testified under oath in the present case that Clark made that statement when firing him. Clark and another official of the company who was present deny it, and Dillard has submitted notes taken contemporaneously with the meeting that do not mention the statement. However, as we explained earlier, for present purposes we are required to resolve all evidentiary disputes in favor of Merritt.

6

The district court rejected Merritt's argument, reasoning that because he had not voluntarily assisted in Moore's suit, he did not participate in a Title VII proceeding within the meaning of the statutory language. The district court's factual premise stacks up well against the evidence, but its legal premise, that involuntary participation and unwilling assistance are not conduct protected from retaliation, will not stand up against the statutory language.

In construing a statute we must begin, and often should end as well, with the language of the statute itself. *See Good Samaritan Hosp. v. Shalala,* 508 U.S. 402, 409, 113 S.Ct. 2151, 2157, 124 L.Ed.2d 368 (1993); *see also Bailey v. United States,* --- U.S. ----, ----, 116 S.Ct. 501, 506, 133 L.Ed.2d 472 (1995). As the Supreme Court has admonished, "We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Connecticut Nat'l Bank v. Germain,* 503 U.S. 249, 253-54, 112 S.Ct. 1146, 1149, 117 L.Ed.2d 391 (1992); *see also, e.g., United States v. LaBonte,* --- U.S. ----, ----, 117 S.Ct. 1673, 1677, 137 L.Ed.2d 1001 (1997) ("We do not start from the premise that this language is imprecise. Instead, we assume that in drafting this legislation, Congress said what it meant."). "When the words of a statute are unambiguous, then, this first canon [of statutory construction] is also the last: judicial inquiry is complete." *Connecticut Nat'l Bank,* 503 U.S. at 254, 112 S.Ct. at 1149 (internal quotation marks omitted).

The anti-retaliation provision is straightforward and expansively written. Congress chose the language "testified" and "participated in any manner" to express its intent about the activity to be protected against retaliation. The word "testified" is not preceded or followed by any restrictive language that limits its reach. As to "participated in any manner," the adjective "any" is not ambiguous; it has a well-established meaning. Earlier this year, the Supreme Court explained, "Read naturally, the word "any' has an expansive meaning, that is, "one or some indiscriminately of whatever kind.' " *United States v. Gonzales,* --- U.S. ----, ----, 117 S.Ct. 1032, 1035, 137 L.Ed.2d 132 (1997) (citation omitted). Here, as in *Gonzales,* "Congress did not add any language limiting the breadth of that word," so "any" means all. *See id.*

7

By giving deposition testimony, albeit reluctantly, Merritt "testified" in Moore's Title VII proceeding. Merritt was asked questions about whether certain sexually harassing activity occurred, and he gave answers under oath. Simply put, that is how one testifies. By the same token Merritt also "participated" in Moore's Title VII proceeding. One who has participated as a reluctant deponent has "participated in any manner," i.e., in the manner of a reluctant deponent. Thus Merritt "testified" and "participated in any manner" in Moore's Title VII lawsuit. *See Pettway v. American Cast Iron Pipe Co.,* 411 F.2d 998, 1006 n. 18 (5th Cir.1969) (noting "exceptionally broad protection" afforded by Title VII's inclusion of assistance and participation in any manner); *see also Johnston v. Harris County Flood Control Dist.,* 869 F.2d 1565, 1571-73 (5th Cir.1989) (affirming judgment on retaliation claim where plaintiff testified in coemployee's administrative hearing concerning charge of discrimination); *Truelove v. Trustees of Univ. of Dist. of Columbia,* 744 F.Supp. 307, 313 (D.D.C.1990) (holding that protected activity includes testifying in federal court in another employee's discrimination case). *Cf. Smith v. Georgia,* 684 F.2d 729, 730, 733 (11th Cir.1982) (recognizing as "undisputed" district court's holding that plaintiff made out prima facie case where he testified at coemployee's sex discrimination grievance hearing).

The district court thought that Title VII's anti-retaliation provision does not cover an involuntary witness who is opposed to the claimant's position, because that provision was designed to protect those who "aid" and "assist" Title VII claimants. There are two insurmountable problems with that reasoning. First, whatever design might be perceived behind the provision, the actual design put forward through the language of the provision does not require that the testimony or other participation aid or assist the claimant. Instead of making assistance to the claimant a prerequisite for protection against retaliation, Congress chose to make assistance only one of four alternative means of qualifying for such protection. Congress prohibited retaliation against anyone who "made a charge, testified, assisted, *or* participated in any manner." 42 U.S.C. § 2000e-3(a) (emphasis added). Under the plain language of the provision, those who testify or otherwise participate in a

8

Title VII proceeding are protected from retaliation for having done so, even if it turns out they were not of any assistance to the Title VII claimant.

The second problem with the district court's reasoning is that it equates the objective effect of participation—whether it aids or assists a claim—with the subjective intent of the participant. The assumption appears to be that an involuntary participant cannot be of any use to an enterprise. That is no more true of conscripted deponents than it is of conscripted soldiers. Even if assistance were a sine qua non for coverage under the anti-retaliation provision, a Title VII claimant can be assisted as much or more by the testimony of a hostile co-employee from whom the truth must be wrenched as by an employee who earnestly desires to help (but may not be in the position to do so). The point is well illustrated in this case. He hated to do so, and he tried every way to avoid it, but Merritt's reluctant deposition testimony did assist Moore in her claim against Dillard. Indeed, in the words of Dillard's President, that testimony was "the most damning to Dillard's case." So, even if assistance were a prerequisite to coverage under the anti-retaliation provision, Merritt did assist Moore's lawsuit, even though it was against his wishes.

The gist of the district court's holding and Dillard's position goes beyond the question of assistance per se. The underlying proposition is that no conduct qualifies for protection under the anti-retaliation provision unless it is done voluntarily for the purpose of assisting the claimant. Congress could have crafted the statutory provision that way. But it did not. Congress said "testified" and "participated in any manner," not "voluntarily testified" and "voluntarily participated." There is no mention of motive in the statutory provision. Courts have no authority to alter statutory language. We cannot add to the terms of Title VII's anti-retaliation provision what Congress left out: the requirement of a good motive, a pure heart, a happy face.

None of the authority cited by Dillard persuades us to the contrary. Dillard points to *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 796, 93 S.Ct. 1817, 1821, 36 L.Ed.2d 668 (1973), for the proposition that the anti-retaliation provision "forbids discrimination against applicants or employees for attempting to protest or correct allegedly discriminatory conditions of

9

employment." That statement from the facts and procedural history of the opinion is true as far as it goes, but it does not require a different result in this case. *McDonnell Douglas* was concerned solely with the opposition clause and left the participation clause out of its discussion of the anti-retaliation provision. 411 U.S. at 796 n. 4, 93 S.Ct. at 1821 n. 4. The opposition clause by its very nature focuses upon the motive of the employee, covering only one who "has opposed" any practice which violates Title VII. By contrast, the participation clause, which is what the present case is about, is not so limited. *See Booker v. Brown & Williamson Tobacco Co.,* 879 F.2d 1304, 1312 (6th Cir.1989) (explaining how the participation clause provides wider and stronger protection than the opposition clause). Whatever fetters *McDonnell Douglas* clamped onto the anti-retaliation provision, they were put on the opposition clause only; the broad language of the participation clause was left unfettered.

Dillard also relies on *Whatley v. Metropolitan Atlanta Rapid Transit Auth.,* 632 F.2d 1325, 1328 (5th Cir.1980), in which this Court's predecessor explained that "[section 2000e-3(a) ] is the primary source of protection against retaliation for those who participate in the process of vindicating civil rights through Title VII." This statement from *Whatley,* which is descriptive dictum instead of a holding construing the anti-retaliation provision, is like the statement Dillard relies upon from *McDonnell Douglas.* It is true insofar as it goes. But nowhere in *Whatley* does the court confine anti-retaliation protection *only* to those who "vindicate" rights under Title VII. In fact, the next sentence of the opinion talks of the "broad protection [ ] afforded to the participant." *Id.* (citing *Pettway,* 411 F.2d at 1006 n. 18). Nothing in either *McDonnell Douglas* or *Whatley* restricts the broad protection afforded by the plain language of the participation clause only to those who volunteer in the war against discrimination.

We finish up this part of our discussion by addressing two concerns that the district court had about the "undesirable consequences" which would flow from interpreting the statute in the manner in which we believe it must be interpreted. The first consequence the district court foresaw is that such an interpretation "would mean that employers would be on dangerous ground in disciplining

10

or discharging employees who have engaged in discriminatory conduct or are believed in good faith to have done so." The reason is that once such an employee responded to an EEOC investigation or a lawsuit by making a statement or giving testimony, he would be protected from any retaliation and would claim that any adverse employment action against him was retaliation. That set of circumstances would, the district court feared, have a chilling effect on compliance with Title VII by making employers more reluctant to fire sexually harassing employees like Merritt once they have given a deposition or otherwise participated in a Title VII proceeding. While the district court's reservation is a legitimate one, such policy concerns cannot alter our interpretation and application of clear statutory language. Through its enactments Congress sets the federal policy of this nation in the employment discrimination area as well as in other areas, and it is up to Congress to make policy judgments about concerns such as this one. Once Congress has expressed its resolution of such concerns in a statute, it is the duty of the courts to give effect to that resolution by applying the statute according to its terms. We cannot refuse to give effect to the legislative will merely because we think Congress has acted unwisely.

Of course, if giving the words of a statute their plain and ordinary meaning produces a result that is not just unwise but is clearly absurd, another principle comes into the picture. That principle is the venerable one that statutory language should not be applied literally if doing so would produce an absurd result. *See, e.g., Rowland v. California Men's Colony,* 506 U.S. 194, 200 & n. 3, 113 S.Ct. 716, 720 & n. 3, 121 L.Ed.2d 656 (1993); *United States v. Oboh,* 92 F.3d 1082, 1085 (11th Cir.1996) (en banc) (citation omitted), *cert. denied,* --- U.S. ----, 117 S.Ct. 1257, 137 L.Ed.2d 337 (1997). Though venerable, the principle is rarely applied, because the result produced by the plain meaning canon must be truly absurd before this principle trumps it. Otherwise, clearly expressed legislative decisions would be subject to the policy predilections of judges.

This is not a case where the absurd results principle is operative, because we cannot say that application of the plain meaning of the anti-retaliation provision's language produces an absurd result. Congress could well have decided that encouraging truthful testimony by even the sexual

11

harassers themselves was important enough to vindication of Title VII claims to justify whatever deleterious effect it might have on the vigor with which employers discipline guilty employees. Congress could well have decided that even with a broadly written anti-retaliation provision employers would still have enough room and sufficient incentive to discipline miscreant employees. We may not have made the same policy decision had the matter been ours to decide, but we cannot say that it is absurd, ridiculous, or ludicrous for Congress to have decided the matter in the way the plain meaning of the statutory language indicates it did.

An admittedly extreme hypothetical will illustrate the point. Suppose an employee has been guilty of sexually harassing another employee who, as a result, brings a Title VII lawsuit against the employer. The miscreant employee is subpoenaed and with great reluctance testifies truthfully about his misbehavior, thereby unwillingly assisting the victim with her Title VII lawsuit. Suppose further that the employer makes it known to all his other employees that the reason that employee is being fired is not his egregious sexually harassing behavior, but instead his truthful testimony under subpoena. "We don't mind sexual harassment," the employer says, "after all, boys will be boys. But one thing we will never tolerate is anyone stupid enough to admit it in sworn testimony that damages the company. If you get caught and want to keep your job, you'd better lie." If we adopted Dillard's position concerning the anti-retaliation provision, an employer could do just that. However, we reject that position, because it is contrary to the plain statutory language, and it is not absurd to believe Congress decided that the net effect of prohibiting such retaliatory policies and practices would be to advance the goals of Title VII.

Nothing we say is intended to imply that the anti-retaliation provision in Title VII prohibits an employer from imposing discipline, including termination, on any employee who sexually harasses or otherwise discriminates against other employees. The employer may take adverse action against such an employee because of a feeling that justice demands it, or for the more parochial reason of minimizing future liability, but not because the employee "testified, assisted, or participated in any manner" in another employee's Title VII proceeding.

12

The second policy concern the district court had was that interpreting the anti-retaliation provision as we have "would have the potential for inundating the federal judiciary with lawsuits by employees alleging that they could not be disciplined or discharged for their wrongdoing" because they had responded to an EEOC investigation or participated in a Title VII lawsuit. It is within the authority of Congress to decide what federal causes of action should exist. Because Congress has never shown an overarching concern about the size of federal court dockets, caseload considerations do not provide a valid basis for questioning whether the statutory language at issue in this case accurately reflects congressional intent. For good or ill, Congress has decided that individuals who have "testified, assisted, or participated in any manner" in a Title VII proceeding are entitled to protection from retaliation because of that participation, and we must make room on our dockets for any resulting cases.

In summary, neither Dillard's arguments nor the district court's reasoning convinces us that Merritt's deposition testimony is outside the protection afforded by the plain language of the anti-retaliation provision's participation clause. Merritt participated in Moore's Title VII lawsuit. He testified as a witness. As a result, he was entitled to protection, although not from being fired because of his sexually harassing behavior and its ill effects on the company. He was entitled to protection only from retaliation against him because of his participation as a deponent. We turn now to Dillard's argument, and the district court's holding, that Dillard was entitled to summary judgment on the ground Merritt was fired because of his sexually harassing behavior, not his deposition testimony.

### B. DIRECT EVIDENCE OF DISCRIMINATION

The district court held that even if Merritt's deposition testimony was protected activity, Dillard was entitled to summary judgment anyway. The court based that alternative holding on its belief that there was no direct evidence of discrimination, and that Merritt had failed to present sufficient evidence to create a genuine issue of material fact that the legitimate reason Dillard gave for terminating Merritt (his sexually harassing behavior) was pretextual. As we have held, "Where

the non-movant presents direct evidence that, if believed by the jury, would be sufficient to win at trial, summary judgment is not appropriate even where the movant presents conflicting evidence." *Mize v. Jefferson City Bd. of Educ.,* 93 F.3d 739, 742 (11th Cir.1996). Accordingly, we turn to the question of whether there was direct evidence of retaliation in this case.

We have defined direct evidence as "evidence, which if believed, proves existence of fact in issue without inference or presumption." *Rollins v. TechSouth, Inc.,* 833 F.2d 1525, 1528 n. 6 (11th Cir.1987) (citation, emphasis and brackets omitted). Evidence that only suggests discrimination, *see Earley v. Champion Intern. Corp.,* 907 F.2d 1077, 1081-82 (11th Cir.1990), or that is subject to more than one interpretation, *see Harris v. Shelby County Bd. of Educ.,* 99 F.3d 1078, 1083 n. 2 (11th Cir.1996), does not constitute direct evidence. In a long line of cases, this Court has found direct evidence where "actions or statements of an employer reflect[ ] a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee." *Caban-Wheeler v. Elsea,* 904 F.2d 1549, 1555 (11th Cir.1990). *See Haynes v. W.C. Caye & Co., Inc.,* 52 F.3d 928, 930 (11th Cir.1995) (holding that statement questioning whether "sweet little old lady could get tough enough" to do job and statement that "a woman was not competent enough to do this job" constitute direct evidence); *Burns v. Gadsden State Community College,* 908 F.2d 1512, 1518 (11th Cir.1990) (holding that statement that "no woman would be named to a B scheduled job" constitutes direct evidence); *Caban-Wheeler,* 904 F.2d at 1555 (holding that defendant's statement that program needed a black director constitutes direct evidence); *E.E.O.C. v. Alton Packaging Corp.,* 901 F.2d 920, 923 (11th Cir.1990) (holding that general manager's statement that "if it was his company, he wouldn't hire any black people" and production manager's statement that "you people can't do a thing right" constitute direct evidence); *E.E.O.C. v. Beverage Canners, Inc.,* 897 F.2d 1067, 1068 n. 3, 1072 (11th Cir.1990) (holding that plant manager's constant barrage of racial slurs and statements such as "[t]hose niggers out there will not get anywhere in this company" constitute direct evidence); *Sennello v. Reserve Life Ins. Co.,* 872 F.2d 393, 394, 395 (11th Cir.1989) (holding that statement that "we can't have women in

14

management" constitutes direct evidence); *Walters v. City of Atlanta,* 803 F.2d 1135, 1141-42 (11th Cir.1986) (holding that memorandum requesting a new list of candidates because "current register ... does not include any minority group representation" constitutes direct evidence); *Wilson v. City of Aliceville,* 779 F.2d 631, 633, 636 (11th Cir.1986) (holding that mayor's statement that "he wasn't gonna let no Federal government make him hire no god-dam nigger" constitutes direct evidence); *Thompkins v. Morris Brown College,* 752 F.2d 558, 561, 563 (11th Cir.1985) (holding that college president's statement that he saw no reason for a woman to have a second job and statement that males had families and needs that female plaintiff did not constitute direct evidence); *Miles v. M.N.C. Corp.,* 750 F.2d 867, 874-75 (11th Cir.1985) (holding that plant manager's statement that he wouldn't hire blacks because "[h]alf of them weren't worth a shit" constitutes direct evidence); *Bell v. Birmingham Linen Serv.,* 715 F.2d 1552, 1553, 1557 (11th Cir.1983) (holding that supervisor's statement that he would not put woman in washerman position because "every woman in the plant would want to go into the washroom" constitutes direct evidence); *but see Harris,* 99 F.3d at 1082, 1083 n. 2 (holding that statement that "under the circumstances we did not need to employ a black at Thompson High School" open to more than one interpretation and thus not direct evidence).

As we have explained in the age discrimination context, the quintessential example of direct evidence would be "a management memorandum saying, "Fire Earley—he is too old.'" *Earley,* 907 F.2d at 1081; *see also, e.g., Rollins v. TechSouth, Inc.,* 833 F.2d 1525, 1528 n. 6 (11th Cir.1987) (giving virtually identical example).

Merritt contends that the record in this case contains a statement that constitutes direct evidence of retaliatory motive. Specifically, Merritt points to Clark's statement that "[y]our deposition was the most damning to Dillard's case, and you no longer have a place here at Dillard Paper Company." It is uncontested that Clark, the president of Dillard, was a decisionmaker. It is also uncontested that Clark took adverse employment action against Merritt: he was fired. As the first clause in the compound sentence makes clear, Merritt was fired because of his deposition

15

testimony in Moore's case, which is participation in protected activity. Clark's statement conforms to the general pattern of statements constituting direct evidence found in our race and gender discrimination decisions.

Dillard argues that Clark's statement is not direct evidence of discrimination, because it only implies discrimination and accordingly is merely circumstantial evidence. We reject this argument. We can discern no material difference between Clark's statement and a statement saying, "Fire Earley—he is too old," which we have previously said constitutes direct evidence of discrimination. *Earley,* 907 F.2d at 1081. The statement made in the present case is the equivalent of "Fire Merritt—he gave the most damning deposition testimony."

The direct nature of the evidence the alleged statement in this case provides can be illustrated another way. Substitute for the explanatory introductory clause "Your deposition was the most damning to Dillard's case" the following: "You are black." Is there any doubt that the statement "You are black, and you no longer have a place at Dillard Paper Company" would be considered direct evidence of discrimination? We think not. It is immediately obvious that the second clause "you no longer have a place at Dillard Paper Company" is linked by the conjunction "and" to the first clause "You are black" in such a way as to communicate cause and effect.

Neither Dillard nor the district court offer any other interpretation of Clark's statement, any explanation for what was meant if not that Merritt was being fired because his deposition testimony damaged Dillard's position in the Title VII lawsuit. We conclude that there is no other reasonable interpretation and that Clark's statement constitutes direct evidence of retaliation. Because we hold that Merritt has presented sufficient direct evidence to survive summary judgment, we do not address his *McDonnell Douglas* argument and whether he has presented evidence of pretext.

## C. SOME CLOSING THOUGHTS

We recognize that our holding allows a man who admitted to engaging in sexual harassment to take his termination case to a jury. We are emphatically *not* holding, however, that an alleged sexual harasser cannot be fired. In fact, it may be prudent for an employer to fire or otherwise

16

discipline a sexual harasser in order to avoid Title VII liability in the future. Merritt himself concedes that Dillard could have fired him any time before his deposition. We go further than that. Dillard could have fired Merritt *after* he gave his deposition testimony, as well, so long as it did not fire him because he "testified, assisted, or participated in any manner" in a Title VII investigation or proceeding.

We do not think that the anti-retaliation provision puts an employer in a no-win situation, where it will be held liable whether or not it disciplines a sexual harasser—liable now if it does, or liable in the future if it does not. Employers can discipline their employees for any reason not prohibited by Title VII and its anti-retaliation provision, and they certainly can discipline employees for sexually harassing behavior. We believe that in virtually every case where an employer disciplines an employee guilty of sexually harassing behavior and the employee files a lawsuit claiming retaliation because of his participation in a Title VII investigation or proceeding, the employer will be entitled to summary judgment. We predict that summary judgment will be the rule, because in the typical case the disciplined employee will have neither direct evidence of retaliatory motive nor evidence that the employer's stated reason—the employee's sexually harassing behavior—is pretextual. The present case is the exception, the rare case where there is direct evidence of retaliatory motive.

Dillard's "the sky is falling" argument prompts us to make another observation. Even in the rare case in which a sexual harasser who has gotten his just desserts from the employer can survive summary judgment and then persuade the factfinder that he was disciplined because of his participation in the victim's Title VII proceeding, it may be a pyrrhic victory for him. Under 42 U.S.C. § 2000e-5(g)(2)(B), if the employer can convince the factfinder that it would have made the same decision in the absence of a retaliatory motive, the employee will not receive damages, reinstatement, and the like. For example, even if Clark made the statement Merritt attributes to him, Merritt is still not entitled to damages or reinstatement if he would have been fired anyway because of his sexually harassing behavior.

17

D. THE TELEPHONE TRANSCRIPTS ISSUES

In its order granting summary judgment, the district court also struck, as hearsay, transcripts of telephone conversations Merritt had with ten of his former female coworkers at Dillard. Merritt contends that these transcripts are not hearsay and that the district court erred in striking them. Merritt submitted the transcripts in support of his argument that Dillard's legitimate nondiscriminatory reason for firing him was pretextual. Because Merritt submitted direct evidence of discrimination sufficient to survive summary judgment, we have not addressed Merritt's *McDonnell Douglas* pretext argument. We accordingly decline to answer the question of whether the transcripts, submitted only in support of the pretext argument, are admissible at the summary judgment stage, *see McMillian v. Johnson,* 88 F.3d 1573, 1583-85 (11th Cir.), *amended in unrelated part,* 101 F.3d 1363 (1996) (on rehearing), and express no view on whether the transcripts are admissible for any purpose.[2]

## IV. CONCLUSION

The district court's grant of summary judgment in favor of Dillard is REVERSED, and the case is REMANDED to the district court for further proceedings consistent with this opinion.

---

[2]Merritt argues that the district court also erroneously struck a transcript of a conversation Merritt had with Joe Strong, Dillard's Birmingham office's vice-president and general manager. Dillard's motion to strike and the district court's order only encompass the transcripts with the ten female coworkers. The Strong transcript was never stricken from the record, and, therefore, we do not address Merritt's argument regarding it.