**[PUBLISH]**

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

————————————

No. 97-9229

————————————

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
10/06/98
THOMAS K. KAHN
CLERK

D.C. Docket No. 4:96-CV-5-DF

D. LISA CLOVER,

Plaintiff-Appellee,

versus

TOTAL SYSTEM SERVICES,
INC.,

Defendant-Appellant.

————————————————————————

Appeal from the United States District Court
for the Middle District of Georgia

————————————————————————
**(October 6, 1998)**

Before CARNES and HULL, Circuit Judges, and HENDERSON, Senior
Circuit Judge.

CARNES, Circuit Judge:

Plaintiff D. Lisa Clover, a former employee of defendant Total System Services, Inc. ("TSYS"), brought this lawsuit, claiming that TSYS discharged her in retaliation for her cooperation in a TSYS internal investigation of a sexual harassment complaint. A jury awarded Clover $25,000 in compensatory damages and $160,000 in punitive damages. TSYS moved for judgment as a matter of law, contending that the evidence Clover adduced at trial was insufficient to support a claim of retaliatory discharge. The district court denied that motion, and TSYS appeals the denial. Because we conclude that Clover's claim is legally insufficient to constitute a retaliatory discharge under Title VII, we reverse.

## I. BACKGROUND

Lisa Clover began working for TSYS, a credit and debit card data processor, in 1988. At the time of her termination on March 24, 1995, she was working as a microfiche clerk in the Support Services Division of TSYS. Her immediate supervisor was Annette Jones. Jones' supervisor

was Allen Pettis.  The entire Support Services Division was managed by Walter Miller.

On March 22, 1995, Audrey Hollingsworth, Assistant Vice President of TSYS' Human Resource Management Division ("Human Resources") asked Jones to have Clover report to the Human Resources office on March 23, 1995 for a meeting.  Apparently, there was some confusion about the meeting time.  While Clover believed that the meeting was set for 9:15 a.m., Hollingsworth thought that it was scheduled for 9:00 a.m.

Worried that the purpose of the meeting might be to inform her of downsizing in her department, Clover spent the evening of March 22, 1995 preparing a resume.  The next morning, March 23, 1995, Clover reported to the Human Resources office a few minutes after 9:15.  She concedes that she arrived late.  Clover told Hollingsworth that her lateness was the result of running a school errand for her nephew.

At the Human Resources meeting, Hollingsworth and Marcus Calhoun, TSYS' legal counsel, informed her that they were conducting an internal TSYS investigation concerning allegations of sexual harassment

made by Courtney Waters, a former Clover co-worker, against Pettis. Although the record does not indicate that Clover knew it at the time, the in-house investigation was being conducted in response to TSYS having been informed that Waters had filed an EEOC charge against it. For thirty to forty minutes, Hollingsworth and Calhoun asked Clover questions concerning her knowledge of the office interaction between Waters and Pettis. Once the meeting ended, Hollingsworth told Clover she was free to return to her own office, which was located across town.

Because Clover had left her wallet at home, she did not return directly to her office. She arrived at her office around 10:45 a.m., at which time Jones informed her the Human Resources meeting was confidential and she should not tell anyone about it. Jones also told her that she needed to speak with her about her most recent tardiness. Although Clover was a good worker, she was often tardy, and had been threatened with probation in the past because of her lateness. Jones was aware that Clover had arrived late at the Human Resources office and also felt that Clover had not promptly returned to work after the meeting.

3

Jones arranged a meeting with Pettis and Clover to discuss Clover's tardiness. At Clover's request, Miller joined the meeting. At that meeting, Clover admitted she had been late to the Human Resources meeting. At trial there was some dispute about the explanation Clover gave for being late. According to Miller, Clover claimed during their meeting that she was late because she was up late the night before preparing a resume. However, at the Human Resources meeting, Clover had told Hollingsworth that she was late because she ran an errand for her nephew.

Thereafter, Jones recommended that Clover be terminated immediately, but Miller disagreed. He said he would look into the possibility of finding a job for Clover in another department. The next day, Miller informed Clover he was terminating her employment because she had given conflicting explanations for her tardiness. Miller said he had learned from Hollingsworth that Clover told her that she was late to the Human Resources meeting because she had an errand to run for her nephew, which conflicted with the explanation Clover gave him, namely that she had been up late preparing her resume. After some discussion,

4

Miller agreed to reconsider his decision if Clover could work out her differences with Hollingsworth. Clover subsequently met with Hollingsworth, but they failed to reach an agreement. Hollingsworth called Clover on March 27, 1995 to tell her that her termination was final and that she had been terminated for giving "false information."

Clover subsequently sued TSYS, alleging unlawful retaliation in violation of 42 U.S.C. § 2000e-3(a). Specifically, she claimed that TSYS terminated her in retaliation for her participation in the investigation of the sexual harassment allegations against Pettis and for her opposition to that alleged sexual harassment. A jury found in Clover's favor and awarded her $25,000 in compensatory damages and $160,000 in punitive damages. TSYS filed a motion for judgment as a matter of law on Clover's retaliation claim and her claim for compensatory damages. The district court denied that motion and TSYS appealed.

## II. STANDARD OF REVIEW

We review <u>de novo</u> a denial of judgment as a matter of law. <u>See</u>, <u>e.g.</u>, <u>Wideman v. Wal-Mart Stores, Inc.</u>, 141 F.3d 1453, 1454 (11th Cir. 1998).

## III. DISCUSSION

TSYS contends that the district court erred in denying it judgment as a matter of law on Clover's retaliation claim. That contention potentially raises three issues: (1) whether the district court erred in concluding Clover presented sufficient evidence for the jury to find that Clover engaged in statutorily protected conduct; (2) whether the district court erred in concluding Clover presented sufficient evidence for the jury to find that Clover established the requisite causal connection between her alleged statutorily protected activity and her termination; and (3) whether the district court erred in concluding Clover presented sufficient evidence for the jury to find that TSYS' proffered nondiscriminatory reason for Clover's termination was a pretext for discrimination. Because the evidence presented at trial does not support the conclusion that Clover engaged in statutorily protected conduct, we need reach only the first of these issues to conclude that TSYS was entitled to judgment as a matter of law.

The statutory provision that Clover asserts prohibited TSYS from taking adverse employment action against her, 42 U.S.C. § 2000e-3(a),

recognizes two forms of statutorily protected conduct. An employee is protected from discrimination if (1) "he has opposed any practice made an unlawful employment practice by this subchapter" (the opposition clause) or (2) "he has made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or hearing under this subchapter" (the participation clause). 42 U.S.C. § 2000e-(3)a. The case was submitted to the jury under both clauses, and Clover contends that the facts presented at trial support a verdict in her favor under either clause. Our consideration of both clauses, however, leads us to conclude that neither supports Clover's claim and that TSYS was entitled to judgment as a matter of law.

A. WAS CLOVER'S CONDUCT PROTECTED UNDER THE OPPOSITION CLAUSE?

Clover contends that the statements she made in her meeting with Hollingsworth and Calhoun constituted opposition to an unlawful employment practice, namely, sexual harassment. At the meeting, Clover says, she "described acts that she believed to have been inappropriate or unusual behavior for a member of senior management [i.e., Pettis.]"

7

Specifically, she testified that she told Hollingsworth and Calhoun that Pettis engaged in the following conduct:

(i) Pettis made frequent visits without any "business purpose" to Waters' work area.

(ii) Pettis would call Waters on her personal beeper during work hours.

(iii) Pettis would sometimes knock on the department door where Waters, Clover and other employees worked "to get Waters' attention and to call Waters out into the hall to talk." However, if Clover or another worker looked up, "Pettis would dart behind the door out of sight."

(iv) Pettis hung up "the phone on anybody who answered other than Waters during the day."

(v) Waters responded "to the attention of Pettis in a flirting kind of style."

Clover claims that this testimony constitutes opposition to an unlawful employment practice.

The parties agree that an employee who seeks protection under the opposition clause must have a "good faith, reasonable belief" that her employer has engaged in unlawful discrimination. See Little v. United Technologies, Carrier Transicold Div., 103 F.3d 956, 960 (11th Cir. 1997).

8

TSYS concedes that Clover had a good faith belief that TSYS engaged in unlawful sexual harassment because she sincerely believed that, but TSYS argues that her belief was not objectively reasonable. We agree.

The objective reasonableness of an employee's belief that her employer has engaged in an unlawful employment practice must be measured against existing substantive law. See Harper v. Blockbuster Entertainment Corp., 139 F.3d 1385, 1388 n.2 (11th Cir. 1998) (failure to charge the employee who opposes an employment practice with substantive knowledge of the law "would eviscerate the objective component of our reasonableness inquiry.").

To establish a hostile environment claim premised on sexual harassment, a plaintiff must establish, among other things, that "the harassment occurred because of her sex," and that "the harassment was sufficiently severe or pervasive to affect a term, condition, or privilege of her employment." Huddleston v. Roger Dean Chevrolet, 845 F.2d 900, 904 (11th Cir. 1993). Clover contends that her belief that Pettis engaged in sexual harassment attributable to TSYS was objectively reasonable "based

9

on the nature of [Pettis'] conduct in connection with [Waters,] a seventeen year old high school student combined with Pettis' position in the company [as an assistant vice-president.]"  However, the mere disparity between Pettis' and Waters' ages and positions in the company does not make Clover's belief objectively reasonable. None of the conduct that Clover described comes anywhere near constituting sexual harassment, regardless of the relative positions of the employees involved.  As the Supreme Court recently stated:

> [T]he statute does not reach genuine but innocuous differences
>
> in the ways men and women routinely interact with members of
>
> the opposite sex.  The prohibition of harassment on the basis of
>
> sex requires neither asexuality nor androgyny in the workplace;
>
> it forbids only behavior so objectively offensive as to alter the
>
> "conditions" of the victim's employment.

Oncale v. Sundowner Offshore Servs., Inc., 118 S. Ct. 998, 1002-03 (1998). The Supreme Court has said that the conduct in question must be severe or pervasive enough that a reasonable person would find it hostile

10

or abusive. That requirement is crucial to ensuring that courts and juries do not mistake ordinary socializing in the workplace, including intersexual flirtation, for discriminatory "conditions of employment." See id. at 1003.

We do not mean to hold that the conduct opposed must actually be sexual harassment, but it must be close enough to support an objectively reasonable belief that it is. The conduct Clover described misses the mark by a country mile. It follows that Clover's belief that the conduct created a sexually hostile environment for Waters was not objectively reasonable. Nor did Clover relate any facts at all showing that Pettis, or anyone else, had subjected Waters to quid pro quo sexual harassment.

Although dissenting only from our participation clause holding, Judge Henderson's separate opinion also expresses some concerns about our opposition clause holding. In expressing those concerns, he states that "the conduct in question" was "sufficiently disturbing to lead Ms. Waters to file an EEOC complaint based on it and for the company to initiate an in-house investigation involving outside legal counsel." To begin with, the company's in-house investigation, which began before Clover was

11

interviewed, was not based on anything Clover said but instead was a response to the EEOC complaint Ms. Waters had filed.

Moreover, the quoted statement of concern from the dissenting opinion confuses the conduct Clover opposed, i.e., what she saw or heard and then reported during the in-house interview, with the actual conduct Ms. Waters experienced and reported in her complaint to the EEOC. There is nothing in the record to suggest that the two are the same. For opposition clause purposes, "the conduct in question" does not include conduct that actually occurred – or that was averred in an EEOC complaint by the alleged victim – but was unknown to the person claiming protection under the clause. Instead, what counts is only the conduct that person opposed, which cannot be more than what she was aware of. Additional conduct or allegations unknown to the opposing person are not relevant to the opposition clause inquiry. Clover's belief that the conduct she described created a sexually hostile environment was objectively unreasonable, therefore, she did not engage in statutorily protected activity under the opposition clause.

**B. DID CLOVER ENGAGE IN PROTECTED ACTIVITY UNDER THE PARTICIPATION CLAUSE?**

Clover contends she engaged in statutorily protected activity under the participation clause because her participation in TSYS' investigation of Waters' charge of discrimination constitutes "participat[ion] in any manner in an investigation . . . under this subchapter [i.e., subchapter VI of Chapter 21 of Title 42 (42 U.S.C. § 2000e)]." 42 U.S.C. § 2000e-3(a). TSYS, on the other hand, contends that participating in an internal employer investigation is not protected conduct because an internal inquiry is not an "investigation . . . under this subchapter."  It relies upon dicta from Silver v. KCA, Inc. 586 F.2d 138, 141 (9th Cir. 1978), that participation conduct is "participation in the machinery set up by Title VII to enforce its provisions."  Whether the participation clause protects Clover from retaliation for the statements she made in the TSYS Human Resources meeting depends upon whether participation in an employer's internal investigation of a discrimination charge is participation in an "investigation . . . under this subchapter."

Subchapter VI of chapter 21 of title 42 fails to define precisely what constitutes an "investigation . . . under this subchapter," which is the only type of investigation that the participation clause covers. However, examination of the context in which the word "investigation" appears in that subchapter leads us to conclude that an "investigation . . . under this subchapter" means an unlawful employment practice investigation conducted by the Equal Employment Opportunity Commission ("EEOC") or its designated representative. It does not mean an employer's in-house investigation. The term "investigation" and its derivative "investigate" appear in several other sections besides § 2000e-3(a). Every time either term appears, without exception, the context indicates that the statute is concerned only with EEOC investigations.

The terms "investigations" and "investigate" are found in code sections that outline EEOC authority and responsibility in conducting its investigations of unlawful employment practice charges. For example, § 2000e-6 indicates that the EEOC has the authority to conduct official

investigations of alleged unlawfully discriminatory employment practices. In that section, the term "investigate" appears as follows:

> [T]he Commission shall have authority to <u>investigate</u> and act on a charge of a pattern or practice of discrimination, whether filed by or on behalf of a person claiming to be aggrieved or by a member of the Commission.

42 U.S.C. § 2000e-6(e) (emphasis added).

The EEOC, not the employer, bears the responsibility for conducting investigations once formal charges have been filed with the Commission. In § 2000e-5(b), "investigation" once again refers to an EEOC investigation:

> Whenever a charge is filed by . . . a person . . . alleging that an employer . . . has engaged in an unlawful employment practice the Commission . . . shall make an <u>investigation</u> thereof. . . . If the Commission determines after such <u>investigation</u> that there is not reasonable cause to believe that the charge is true, it shall dismiss the charge. . . . If the Commission determines after such <u>investigation</u> that

15

there is reasonable cause to believe that the charge is true, the

Commission shall endeavor to eliminate any such alleged unlawful

employment practice.

42 U.S.C. § 2000e-5(b) (emphasis added). This language contemplates the

EEOC bearing responsibility for investigation of any charge of

discrimination, and thus indicates that an "investigation . . . under this

subchapter" will be an EEOC investigation.

Similarly, § 2000e-5(f)(2) suggests that any "investigation" must be

conducted by the EEOC, because that provision authorizes the EEOC to file

suit, should its investigation suggest that such action is necessary:

Whenever a charge is filed with the Commission and the Commission

concludes on the basis of a preliminary investigation that prompt

judicial action is necessary to carry out the purposes of this Act, the

Commission . . . may bring an action . . . .

42 U.S.C. § 2000e-5(f)(2) (emphasis added) . Because the EEOC uses the

results of its investigation to determine whether to file a lawsuit, the

statutory language authorizing the EEOC to file suit contemplates that an EEOC investigation will precede such a lawsuit.

Likewise, § 2000e-8(a) gives the EEOC broad access to evidence in conjunction with investigations, supporting the conclusion that it is responsible for conducting those investigations:

> In connection with any <u>investigation</u> of a charge filed under section 2000e-5 of this title, the Commission or its designated representative shall at all reasonable times have access to, for the purposes of examination, and the right to copy any evidence of any person being investigated or proceeded against that relates to unlawful employment practices covered by this subchapter and is relevant to the charge under <u>investigation</u>.

42 U.S.C. § 2000e-8(a) (emphasis added). In each of these code sections, the term "investigation" refers to an investigation of a charge of discrimination by the EEOC or its representative.

The final mention of "investigations" occurs in § 2000e-9, which states:

For the purpose of all hearings and <u>investigations</u> conducted by the Commission or its duly appointed agents or agencies, section 161 of Title 29 shall apply.

42 U.S.C. § 2000e-9 (emphasis added). This section's use of the term "investigations" is consistent with that of the other sections. None of them use "investigation" in conjunction with inquiries conducted by employers, private individuals, or other entities. The complete absence of any mention of in-house or internal investigations indicates that only EEOC investigations are investigations "under this subchapter." In light of this statutory framework, we conclude that Congress intended the term "investigation . . . under this subchapter" in § 2000e-3(a) to include only investigations of a charge of discrimination that the EEOC or its designated representative conducts. Therefore, the participation clause of 42 U.S.C. § 2000e-3(a) protects against retaliation for cooperation with an investigation of allegedly unlawful employment practices only when the EEOC or its designated representative conducts the investigation.

It is not our role to second-guess congressional judgment. As we said last year: "Courts have no authority to alter statutory language. We cannot add to the terms of Title VII's anti-retaliation provision what Congress left out . . . ." Merritt v. Dillard Paper Co., 120 F.3d 1181, 1187 (11th Cir. 1997).[1] We do note that the policy judgment Congress made not to extend the participation clause's protections to an employer's internal investigation is not without some arguable basis. Congress could have believed that including such investigations under the participation clause might have a chilling effect on an employer's willingness to conduct internal investigations, and that the risk that employers would take adverse employment action against employees who cooperate in internal investigations that the employers themselves initiate was minimal. From those two reasonable premises Congress may have concluded that avoiding

---

[1] Merritt involved participation in a Title VII lawsuit, which undisputedly is a "proceeding . . . under this subchapter," because the subchapter authorizes such lawsuits. The issue was whether involuntary testimony by one of the alleged harassers in a deposition taken by the plaintiff was participation "in any manner." We held it was, interpreting that statutory language to mean what it says: "in any manner." See Merritt at 1186. In this case, we follow the same principle of statutory interpretation in deciding that "investigation . . . under this subchapter" means just that.

19

the deterrent effect on internal investigations outweighed the risk of retaliation for participation in such investigations.

In his thoughtful dissenting opinion, Judge Henderson suggests several reasons why he believes a better policy result would be for the opposition clause to cover participation in internal investigations. He may be correct about what would be the best policy. That issue is open to debate. The authority of Congress to decide such policy issues, however, is not open to debate. Nor is our function debatable. We sit not to second guess, improve, or correct the policy decisions of Congress, but to ascertain and carry out those decisions.

Whatever the reasoning behind the policy decision, Congress was entitled to and did make it, as reflected in the language of § 2000e-3(a). See Merritt, 120 F.3d at 1188 (acknowledging that "[w]e may not have made the same policy decision had the matter been ours to decide," but concluding that it was not absurd or ridiculous for Congress to have decided the way it did). It would have been a simple matter for Congress to say that participation in any investigation related to an unlawful

employment practice was protected, but Congress instead chose to protect only participation in investigations carried out under the subchapter dealing with EEOC investigations. See id. at 1187 ("Congress could have crafted the statutory provision that way. But it did not.").

We note that our interpretation of the phrase "investigation . . . under this subchapter" is supported by an EEOC regulation. Because § 2000e-5(a) authorizes the EEOC to promulgate regulations preventing persons from engaging in unlawful employment practices, a reasonable interpretation of statutory language contained in such a regulation is due deference unless contrary to the expressed intent of Congress. See Chevron, U.S.A., Inc. v. NRDC, 467 U.S. 837, 843, 104 S. Ct. 2778, 2782 (1984) (holding that when Congress has not spoken to precise question at issue, agency charged with administering statute is entitled to deference in interpreting that statute). The EEOC's regulations interpret "investigation" to mean an investigation that it conducts by itself or through its representatives. The pertinent regulation states that:

The investigation of a charge of discrimination shall be made by the Commission, its investigators, or any other representative designated by the Commission.

29 C.F.R. § 1601.15.

Clover participated in an internal TSYS investigation, not an EEOC investigation. That internal investigation began after TSYS was notified by the EEOC Waters had filed a complaint. However, the EEOC did not designate TSYS, against whom the complaint was filed, as its investigative representative. Nothing in the statute or in the EEOC's regulations permits us to treat an employer against whom a charge is filed as an official investigator for the EEOC. The statute and regulations do not require, authorize, or even mention an investigation by the employer. It follows that an employer's internal investigation is not "an investigation . . . under this subchapter" as that term is used in § 2000e-3(a), and therefore participation in internal investigations is not an activity protected by the participation clause.

## IV. CONCLUSION

Because Clover's participation in the TSYS investigation was not statutorily protected activity under either the opposition clause or the participation clause of 42 U.S.C. § 2000e-3(a), TSYS was entitled to judgment as a matter of law on Clover's retaliation claim. The judgment and award of damages in Clover's favor are REVERSED.

HENDERSON, Senior Circuit Judge, dissenting:

The panel majority holds that the jury's verdict in favor of Clover can not be sustained legally under either the opposition clause or the participation clause of Title VII's anti-retaliation provision codified at 42 U.S.C. § 2000e-3(a). I have some concerns about the majority's holding that Clover's claim fails under the opposition clause because her belief that TSYS had engaged in sexual harassment was not

23

objectively reasonable. It seems entirely possible to me that many reasonable young women would have found the conduct in question to be offensive and objectionable. It was apparently sufficiently disturbing to lead Ms. Waters[2] to file an EEOC complaint based on it and for the company to initiate an in-house investigation involving outside legal counsel.[3] I write separately, however, because I find the majority's construction of the participation clause too narrow.

The statute makes it an unlawful employment practice for an employer to discriminate against any employee "because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).[4] The majority notes that the types of participation protected by this provision are not spelled out in the statute but

---

[2]The complainant's name is spelled both "Waters" and "Walters" in the record. It is not clear which is the correct spelling.

[3]Ms. Waters had apparently filed some type of internal complaint against Pettis with the company at some point during 1994, and TSYS had conducted an earlier investigation at that time. The plaintiff was not interviewed in connection with that review.

[4]The statute also protects applicants for employment, individuals in job-training programs, and members - and applicants for membership - in labor organizations. See 42 U.S.C. § 2000e-3(a).

24

nevertheless concludes that an employee is protected only when participating in an investigation conducted by the EEOC or its designated representative. I do not believe that result is required by the language of the statute, prior decisions of this court, or persuasive authority from other courts.

In my view, it is equally reasonable to read the statutory language to mean any investigation into an employment practice rendered illegal by

Title VII. Thus, an employee would be protected by the participation clause once an investigation was begun into conduct which allegedly violated the statute even if a formal EEOC complaint was not in existence at that time. In virtually every instance of an allegation of sexual harassment or other discriminatory conduct, the employer is going to conduct an internal investigation into the matter. Indeed, given the limited resources of the EEOC, the employer's examination of the allegations may be the only detailed one that is carried out. To hold, as does the majority, that an employee is protected if she makes a statement to an investigator for the government agency but is not protected if she makes the identical statement, concerning the same allegation

25

of discrimination, to her employer's representative unduly weakens the assurances afforded by the anti-retaliation provision. As I understand the majority's position, if an EEOC representative had joined Hollingsworth and Calhoun at the March 23, 1995 meeting, Clover would have a valid participation clause claim. I do not believe that this is what Congress intended in enacting this provision. As the former Fifth Circuit Court of Appeals observed in an early Title VII case, the EEOC is an agency with limited powers: it can investigate and attempt conciliation but has no power to compel compliance with its findings regarding discrimination. The burden of enforcing Title VII rights rests, for the most part, with private individuals. Pettway v. American Cast Iron Pipe Co., 411 F.2d 998, 1005 (5th Cir. 1969). Therefore, the success or failure of a charge of retaliation does not turn on the presence or absence of a representative of the EEOC at any given stage of the proceeding.

Even if that position is rejected, however, the jury's verdict in favor of Clover can be sustained. As the majority notes, by the time of Clover's interview, Waters had filed a charge with the EEOC relating to Pettis' behavior, and it was that charge

which prompted the March 23, 1995 interview.[5]  As a result of Waters' action, an investigation under "this subchapter" had clearly commenced by the time of the Clover interview.  That Clover may have been unaware that Waters had filed an EEOC complaint prior to the interview is surely immaterial.  That will be the case with most potential employee witnesses to alleged acts of alleged sexual harassment or other discriminatory conduct.

One difficulty with the majority's opinion is that it would discourage employees with grievances concerning discriminatory treatment from pursuing informal resolution of those matters with management before filing a formal EEOC charge and would certainly discourage other employees from participating in such informal investigations.  At least with respect to opposition clause claims, courts have held that the statute protects "informal protests, such as voicing complaints to employers or using an employer's grievance procedures."  See, e.g., Armstrong v. Index Journal Co., 647 F.2d 441, 448 (4th Cir. 1981).  And the participation clause has generally

_____

[5]For reasons that are not entirely clear from the record, Waters' employment with the company ended at some point late in 1994.  Pettis was promoted after Clover filed the present action.

27

been found to offer far broader protection than the opposition clause, which, of course, has a more limited purpose.  See Sias v. City Demonstration Agency, 588 F.2d 692, 695 (9th Cir. 1978).  The danger of the majority's approach was demonstrated in this case as Clover was initially reluctant to answer questions about the matter and did so only after being assured that she would suffer no reprisals for her cooperation with the in-house investigation.  Yet, the jury that heard the evidence in this case concluded that Clover had in fact been retaliated against for her expressions of concern about Pettis' conduct toward Waters.[6]  I would imagine that TSYS, like any other employer in a similar situation, could have compelled Clover to participate in its internal investigation.  I think it would be unfair to deny to her and other similarly situated employees the freedom from retaliation for such cooperation.

---

[6]During her employment with TSYS, Clover had a recurring problem with tardiness and was counseled about it on a number of occasions.  The plaintiff presented this documentary evidence very early in her case, apparently to lessen its impact on the jury.  Therefore, there was evidence which would have supported a jury finding that the company had a legitimate, non-retaliatory reason for terminating Clover.  The jury, however, heard all the evidence and concluded otherwise.  I do not address this issue further because the majority does not reverse the district court's judgment in favor of the plaintiff on evidentiary grounds.

28

The majority can point to no case which squarely holds that an employee in Clover's situation is not protected against retaliation. There is certainly no decision from this circuit which so holds. The case which arguably provides the strongest support for the majority's conclusion, <u>Vasconcelos v. Meese</u>, 907 F.2d 111 (9th Cir. 1990), is clearly distinguishable. In that case, the plaintiff was terminated for lying during an internal investigation of the alleged sexual harassment. There is no allegation in this case that Clover lied or misrepresented the facts during her interview concerning Pettis' treatment of Waters.[7]

In a case cited by the majority, this court observed last year that the anti-retaliation provision is "expansively written" and protects against retaliation all types of participation in investigations of alleged employment discrimination. <u>Merritt v. Dillard Paper Co.</u>, 120 F.3d at 1186. In <u>Merritt</u>, the court held that an employee who had allegedly sexually harassed a female co-worker and who subsequently had given compelled deposition testimony in a lawsuit brought against the company by the

---

[7]TSYS does contend, however, that Clover gave conflicting reasons for her tardiness in arriving at the March 23, 1995 meeting with Hollingsworth and Calhoun.

29

victim, which was adverse to the company, could avail himself of the protections of the anti-retaliation provision. According to the court, "[u]nder the plain language of the provision, those who testify or otherwise participate in a Title VII proceeding are protected from retaliation for having done so, even if it turns out they were not of any assistance to the Title VII claimant." Id. Today's decision marks a retreat from a reasonable reading of the statute to the extent that it renders enforcement of the retaliation provision virtually ineffective. For this reason, I respectfully dissent.