**Jason JORDAN, Plaintiff,**

v.

**CITY OF UNION CITY, GEORGIA, Defendant.**

Civil Action No. 1:13–CV–02960–AT.

United States District Court,
N.D. Georgia,
Atlanta Division.

Signed March 30, 2015.

A. Bradley Dozier, Jr., Dozier Law Group, LLC, Atlanta, GA, for Plaintiff.

Sharon P. Morgan, Tracy Lynn Glanton, Elarbee, Thompson, Sapp & Wilson, LLP, Atlanta, GA, for Defendant.

## ORDER

AMY TOTENBERG, District Judge.

Plaintiff Jason Jordan was a police officer in training who had anxiety attacks and was terminated after six weeks of employment with the Union City Police Department. Plaintiff argues that he was discriminated against based on Defendant's perception and treatment of his disability in violation of the Americans with Disabilities Act, as amended. 42 U.S.C. § 12101 *et seq.* The matter is currently before the Court on the Magistrate Judge's Report and Recommendation ("R & R") [Doc. 52] that the Defendant City of Union City's ("Union City") Motion for Summary Judgment [Doc. 34] be granted. Plaintiff has filed objections [Doc. 56] and Union City has filed responses thereto [Doc. 57].

## I. LEGAL STANDARD

The Court reviews a Magistrate Judge's R & R for clear error if no objections are filed, and it may "accept, reject, or modify" these findings and recommendations. 28 U.S.C. § 636(b)(1). If a party files objections, the district court must determine de novo any part of the magistrate judge's disposition that is the subject of a proper objection. Fed.R.Civ.P. 72(b); 28 U.S.C. § 636(b). As Plaintiff filed timely objections to certain of the R & R findings and recommendations, the Court reviews those

findings and recommendations on a de novo basis. All other recommendations are reviewed for clear error.

The Court has reviewed the Magistrate Judge's objected-to determinations on a de novo basis. These include her findings and recommendations that (1) Plaintiff was not "regarded as" disabled; (2) Plaintiff was not qualified for the police officer position at issue; (3) Defendant established the direct threat defense; and (4) Plaintiff did not present direct evidence of disability discrimination on the part of Captain Tate, the decisionmaker in this case. Based on findings (1), (2), and (3) above, the Magistrate Judge found that Plaintiff had failed as a matter of law to establish a *prima facie* case of discrimination.

The Court reviews the other aspects of the R & R for clear error. Plaintiff did not object to the Magistrate Judge's presentation of the facts and factual disputes in Section I of the R & R, or her determination that Plaintiff suffered a prohibited action, (R & R at 22–23), and has an impairment. (R & R at 19–20); 29 C.F.R. § 1630.2(h)(2) (defining mental impairment as "Any mental or psychological disorder, such as an ... emotional or mental illness.").[1] Plaintiff also did not object to the Magistrate Judge's determination of the relevant essential functions of a Union City Police Officer. The Court has reviewed Section I and the above determinations, finds no clear error, and adopts them here.

## II. FACTUAL BACKGROUND

As recognized by the Magistrate Judge,

---

1. "[T]he construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong." *Blessitt v. Ret. Plan For Employ-*

*ees of Dixie Engine Co.,* 848 F.2d 1164, 1167–68 (11th Cir.1988) (quoting *Red Lion Broadcasting Co., Inc. v. F.C.C.,* 395 U.S. 367, 381, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969)).

the following facts[2] are properly before the Court on summary judgment. Where there is a dispute of fact, the Magistrate Judge identifies it:

On October 1, 2012, Plaintiff Jason Jordan began his first job in law enforcement as a Union City police officer. [Defendant's Statement of Material Facts ("DSMF") ¶ 1]. Plaintiff Jordan's employment was subject to a six month probationary period during which he was required to complete Union City's Field Training Officer Program. [DSMF ¶¶ 2, 3]. The first phase of the Program requires that the trainee ride with a Field Training Officer ("FTO") for at least 60 days. During this time, the FTO trains on the City's policies and procedures, the law, responding to 911, and initiating activity in the field. [DSMF ¶ 4]. The FTO evaluates the trainee's performance on a daily basis by filling out a Daily Observation Report ("DOR"). [DSMF ¶ 5]. The DORs are forwarded to Captain Eugene Tate, who oversees the FTO Program. [DSMF ¶ 6]. Captain Tate reviews the DORs and monitors the trainee's progress. [DSMF ¶ 7].

On the DORs, one of the headings is "Appearance," and under this is a subheading titled "Fit for Duty: Mentally/Physically." Plaintiff received either a 3 or 4 (out of 5) on all of his DORs under this subheading, which indicates satisfactory or above satisfactory performance in that area. Written on many of the DORs under this subheading was "comes in ready to go." [Plaintiff's Statement of Material Facts ("PSMF") ¶ 2; Tate Declaration ("Dec."), Exhibit ("Ex.") A]. Of the 549 numeric scores Plaintiff received on the DORs that De-

fendant produced in discovery, 491(88%) were a 3 or 4. [Plaintiff's Deposition ("Pla. Dep.") at 173; Crawl Dep., Ex. 3; PSMF ¶ 9].

During his first month of training, Plaintiff was assigned to morning watch (midnight to 8:00 a.m.) and trained with FTOs Walker Heard and Marquis Grant. [DSMF ¶ 8]. Approximately twelve days into Plaintiff's FTO period, FTO Grant noted on Plaintiff's DOR under the heading "Critical Performance Task" that Plaintiff "can be over excited under stress." [Tate Dec. ¶ 3, Ex. A; DSMF ¶ 9]. Less than ten days later, FTO Heard noted on four consecutive DORs under the heading "Critical Performance Task" that Plaintiff is "somewhat timid" under stressful conditions. [DSMF ¶ 10]. However, FTO Heard testified that he left the "somewhat timid" notation on two of the four DORs as nothing more than a reminder to him that this is something he might want to look for in the future, not that there was a specific incident or problem with Plaintiff's performance on those two dates. [Heard Affidavit ("Aff.") ¶ 27; PSMF ¶ 13].

In Captain Tate's experience, it was not uncommon for new officers to show some initial apprehension early in the training program before the officer gained more confidence to effectively perform the job. [DSMF ¶ 16]. According to FTO Heard, Plaintiff did a "very good job" as a new police officer. [Heard Aff. ¶¶ 8–22; PSMF ¶ 6]. Heard stated that Plaintiff interacted well with the public, he was smart and attentive, he wanted to learn, he listened and followed instructions well, he had a good attitude, and he took the job seriously.

---

**2.** Having adopted the Magistrate Judge's fact section, the Court quotes directly from this portion of the R & R.

[Heard Aff. ¶¶ 8, 9; PSMF ¶ 7]. Similarly, FTO Grant stated that his experience with Plaintiff was very positive and that Plaintiff was "superb" with his interactions with the public. [Grant Dep. at 18–19; PSMF ¶ 4]. Grant gave Plaintiff more scores of 4 on his DORs than any other officer whom Grant had trained in the past, which is indicative of commendable performance in the field. [Grant Dep. at 52; Pla. Dep. at 173; Pla. Dec. ¶ 7; PSMF ¶ 8].

Captain Tate testified that during a Taser training session, he observed that Plaintiff was overly apprehensive about being exposed to a Taser and expressed multiple times, "I can't do this. I can't do it. I don't think I can do this." [Tate Dep. at 38–39]. Captain Tate also testified that Plaintiff was flushed, breathing rapidly, and his skin was clammy and that he asked Captain Tate what would happen if he did not participate in the training. [Id.]. Plaintiff disputes much of Captain Tate's testimony about the Taser training and testified, "At most, I questioned what would happen if I chose not to subject myself to the electric shock from the Taser." [Pla. Dec. ¶ 9]. Plaintiff was ultimately exposed to the Taser, as required by the policy of the Union City Police Department. [Tate Dep. at 39–40; Pla. Dec. ¶ 10]. Plaintiff self-administered an additional shock to his leg from the Taser, which was also required. [Pla. Dec. ¶ 10].

In one incident during Plaintiff's field training, he disarmed a man who was in possession of a deadly weapon (firearm) in a car after a traffic stop. [Grant Dep. at 44–48; PSMF ¶ 18]. On another occasion, Plaintiff attempted to pursue fleeing suspects after a high speed chase into a wooded area before the police dogs were dispatched. [Grant Dep. at 44; Pla. Dec. ¶ 8; PSMF ¶ 19]. FTO Grant had to call Plaintiff off and instruct him not to pursue the suspects because it could affect the police dogs' ability to pick up the suspects' scent. [Grant Dep. at 44; Pla. Dec. ¶ 8; PSMF ¶ 20]. Plaintiff also took charge of a situation at an apartment complex when he arrested three male suspects and took them into custody. [Grant Dep. at 5051; PSMF ¶ 21].

In early November 2012, Captain Tate received a DOR from FTO Grant, DOR Number 27, noting that Plaintiff needs to "[s]low down" and that "[w]hen stressed [he] panics." (DSMF ¶ 17; Tate Dec. ¶ 5, Ex. B). FTO Grant further reported on the DOR that when Plaintiff is stressed, he "makes mistakes and is asked to slow down." [DSMF ¶ 18; Tate Dec. ¶ 5, Ex. B]. Captain Tate was asked and testified to the following:

Q. Okay. When you saw that DOR, I mean, did you have some sort of immediate concern about that?

A. Well, everything starts building upon each other. If I start to see the same thing, being timid, doesn't work well under stress, doesn't handle stressful conditions well, those things start to be concerns.

[Tate Dep. at 29]. Captain Tate testified that he did not take any action against Plaintiff after receiving FTO Grant's DOR because Plaintiff was about to be transferred to evening watch with FTO Travis Crawl and Tate was waiting to see whether Plaintiff's response to stressful situations would improve under Crawl's guidance. [Tate Dec. ¶ 5; DSMF ¶ 24]. Captain Tate believed that FTO Crawl was a more aggressive officer than Heard. Tate was hoping that training with Crawl would build Plaintiff's confidence. [Tate Dec. ¶ 5; DSMF ¶ 25].

Around mid-November 2012, Plaintiff began his assignment on evening watch (4:00 p.m. to midnight) with FTO Crawl. [DSMF ¶ 26]. On November 13, 2012, within a couple days of Plaintiff's new assignment, Captain Tate received a memorandum from Sergeant Windell Adams, the evening watch sergeant, stating:

> This memo is to inform you of my concern with Jason Jordan. MPO [Master Police Officer] Crawl came to me after shift briefing and told me that he felt Jordan was too scared to do the job. MPO Crawl advised that in several incidents Jordan showed extreme fear or verbalized being too afraid to do the wrong thing. Crawl advised that Jordan was concerned that his past rejections with other agencies and criminal history would limit his success with finding another job if this one didn't work out. Crawl stated that he advised Jordan to forget about the past and focus on the task at hand. Crawl stated that he expressed to Jordan that the FTO program was design [sic] to teach a willing and able Officer to do the job. I will keep you posted on Jordan's progress in the weeks to come.

[Tate Dec. ¶ 6, Ex. C; DSMF ¶ 27]. Upon receipt of the November 13 memorandum from Sergeant Adams, Captain Tate met with Plaintiff at the beginning of his shift on November 14 to further address the concerns of his three FTOs. [Tate Dep. at 43–46; DSMF ¶ 28]. Plaintiff testified to the following about his meeting with Captain Tate:

> He asked me what's going on, what's wrong, what are you scared of. I explained that I had anxieties. He said what are you scared of. I said I'm scared of doing the wrong thing. And he said, well, there is nothing that you can fuck up that I can't unfuck, now

get out there and get more aggressive. And so, that was the short of the meeting. That's about all it consisted of.

[Pla. Dep. at 182].

Approximately two hours after Plaintiff's meeting with Captain Tate on November 14, 2012, Plaintiff and FTO Crawl were dispatched to a call on Raymond Drive. [DSMF ¶ 31]. Sergeant Adams was the first officer to arrive on the scene, followed by Officer Echols, and then Officer Crawl and Plaintiff. [DSMF ¶ 32]. Adams and Echols first encountered an uncooperative male subject, and when they tried to detain him, he put up a fight. [DSMF ¶ 33]. Plaintiff testified that when he and Crawl arrived at the call on Raymond Drive, he "saw a large black gentleman dressed in all black clothing on the front porch that seemed to have had a gun in his hand, yelling." [Pla. Dep. at 193]. According to Plaintiff, he got out of the car first and was ahead of FTO Crawl. [Id.]. Plaintiff testified that he "ran to what [he] considered cover, which is a large oak tree in front of the house ... [and] investigated for the threat to find out what was actually happening." [DSMF ¶ 34; Pla. Dep. at 193–94]. FTO Crawl then ran past Plaintiff, and at that point, Plaintiff realized that the man on the porch was a police officer. [Pla. Dep. at 195]. Plaintiff then ran with FTO Crawl and arrived at the front porch around the same time or only shortly after Crawl arrived. [Pla. Dep. at 195]. According to Plaintiff, he and Crawl assisted the other officers and helped subdue the subject. [DSMF ¶ 34; Pla. Dep. at 195–96].

Plaintiff testified that after the call, Officer Crawl said, "I would like to have seen you engage a little faster." [Pla. Dep. at 202–03]. Crawl also yelled at

Plaintiff about "hiding behind a tree," and Plaintiff responded, "[S]ir, I did not hide behind the tree." [*Id.* at 203, 207]. Plaintiff stated that his "anxiety became elevated" and he "choked up." [*Id.* at 206–07]. Plaintiff testified:

> [Officer Crawl] looked at me and said, are you okay. And I said, yes, I'm fine. He said, you don't look okay. He said, what's going on. I said, well, I have had feelings like this in the past and it's consistent with my anxiety that I've had in the past—anxiety episode or whatever I might have said. And he said, are you okay, you don't look okay, do I need to call you an ambulance. I said, no, we don't need an ambulance.

[*Id.* at 207–08]. Plaintiff testified that Crawl said, "[L]ook, your face is white and you look like you're breathing heavy ... it looks like you're choked up, what's going on, what's wrong." [*Id.* at 209]. Around this time during the conversation, Plaintiff and FTO Crawl were dispatched to a "shots fired" call. [DSMF ¶ 38; Pla. Dep. at 208–09]. According to Plaintiff, "[Crawl] said, I'm taking you to the fire station to get you evaluated and I explained to him that it wasn't necessary. And he explained to me that he wasn't asking me, he was telling me, we're going to get you checked out real quick. We'll go in here and you can get evaluated." [Pla. Dep. at 208]. Officer Crawl diverted from the shots fired call and took Plaintiff to the nearest fire station for medical attention. [DSMF ¶ 41].

At the fire station, Trey Spivey, an on-duty Firefighter/EMT, evaluated Plaintiff. Spivey took Plaintiff's blood pressure reading and gave him some oxygen. [Spivey Dec. ¶ 3; Pla. Dep. at 212; DSMF ¶ 42]. EMT Spivey determined that Plaintiff's blood pressure and pulse were elevated. [DSMF ¶ 45; Plaintiff's

Response to DSMF ¶ 45]. Plaintiff testified, "While I was at the fire station I heard EMT Spivey tell MPO Crawl that I was okay to return to duty that day." [Pla. Dec. ¶ 23]. Crawl drove Plaintiff back to the Police Department after he was treated at the fire station. [Pla. Dep. at 213; DSMF ¶ 46].

Captain Tate was advised at home of the situation with Plaintiff on November 14, 2012, the same day of the incident. Tate testified that as a safety precaution due to what he perceived to be Plaintiff's emotional instability, Tate directed FTO Crawl to take Plaintiff's weapon and send him home for the night. [Tate Dep. at 54–60; DSMF ¶ 47]. Captain Tate directed Crawl and Plaintiff to meet him at the Police Department the next morning. [Tate Dep. at 56; DSMF ¶ 48]. FTO Crawl and Sergeant Adams left memorandums for Tate before the end of their shift on November 14 expressing their concerns about Plaintiff's ability to perform the job of a police officer. [Adams Dep. at 41–44, Ex. 7; Crawl Dep. at 79–81; Tate Dec. ¶ 9, Ex. D; Tate Dep. at 61–63; DSMF ¶ 49].

On November 15, 2012, Captain Tate met with Plaintiff to discuss Plaintiff's actions the previous evening. [DSMF ¶ 50; Plaintiff's Response to DSMF ¶ 50; Pla. Dec. ¶¶ 24, 25]. Captain Tate started the meeting by expressing to Plaintiff that he (Plaintiff) "made an error yesterday." [DSMF ¶ 51]. Plaintiff responded by saying: "I started the morning off trying to adjust to this new shift, I drank several Monster Energy drinks so I think I had an elevated blood pressure already, but we had our conversation yesterday talking about me being more aggressive and trying to prove something so I felt like maybe I had something to prove." [Tate Dep., Ex. 8; DSMF ¶ 57]. Tate explained that he

had received a report that Plaintiff hid behind a tree and failed to assist the other officers on the Raymond Drive call. [Tate Dep., Ex. 8; DSMF ¶ 52]. In response, Plaintiff stated that he did not recognize Sergeant Adams' voice and that he was investigating what was going on. [Tate Dep., Ex. 8; DSMF ¶ 53]. Plaintiff further stated that he was down on himself after it happened because he second guessed himself about what he "should have done correct." [Tate Dep., Ex. 8; DSMF ¶ 54]. Captain Tate then discussed the situation involving the "shots fired" call and the fact that Plaintiff was "transported over to the fire station to get oxygen...." [Tate Dep., Ex. 8; DSMF ¶ 55]. Plaintiff said that he told FTO Crawl that, although he was "a little stressed," he was fine, but that Crawl insisted on taking him to the fire station anyway. [Tate Dep., Ex. 8; DSMF ¶ 56]. Plaintiff further explained the cause as having "some stressful events on top of the caffeine and on top of everything that we'd had going on that day...." [Tate Dep., Ex. 8; DSMF ¶ 58]. Captain Tate responded by saying:

> I'm going to tell you I think you have anxiety issues because I've done a little investigating of my own and it's not the first time that that's happened. You had a situation that happened at the Academy that supposedly a thunderstorm came through [and] they had to call an ambulance for you. You've got some anxiety issues that you need to deal with.... It's not going to be here. This is your first policing job. If you get terminated from a policing job you won't never [sic] get another policing job. Alright. If you resign from a policing job you'll probably get another policing job somewhere. We're about where the

rubber meets the road and I'm going to give you the option to either resign or I'm going to fire you and that's the only two options that you have. It doesn't matter to me which one you want to do. If you would like to go in there and type up a resignation then I'll accept the resignation from you. If not, I'm going to terminate you today.

[Tate Dep., Ex. 8]. Plaintiff responded by saying, "I'll type up a resignation." [Id.]. Plaintiff typed up his resignation and submitted it to Captain Tate. [Pla. Dep. at 224, Ex. 5; DSMF ¶ 80]. Nobody told Plaintiff the words to type in his resignation letter. [DSMF ¶ 81].

Plaintiff testified that he has been diagnosed with generalized anxiety disorder, cyclothymic disorder, and panic disorder, and that since 2007, he has had several situations where he has experienced heightened anxiety. [Pla. Dec. ¶ 2]. Plaintiff's anxiety episodes occur up to several times a month. [Pla. Dep. at 82; DSMF ¶ 75]. Prior to his employment with Union City, Plaintiff received medical treatment for his anxiety attacks on at least four occasions, including while he was in the police academy. [Pla. Dep. at 70–72, 86, 117, 278; DSMF ¶ 73]. Plaintiff's anxiety condition impacts his ability to process and manage stress. [Pla. Dep., Ex. 10 at 6; DSMF ¶ 65]. The anxiety condition can and has impacted his breathing, blood pressure, heart rate, and adrenal fatigue. [Pla. Dep., Ex. 10 at 6; DSMF ¶ 66]. Plaintiff testified:

> [F]or a long time I thought I had a medical condition. I didn't think it was anxiety. And when I found out that it was actually anxiety, then I found out it was the fear of fear and I was able to manage the fear of fear, so all I had was the initial fear....

When I say fear of fear, I mean, that, oh, my God, I have shortness of breath, oh, my God, I have chest tightness, I have these different things, I must be dying and I think that that's the fear of fear. And my God, I'm dying, it's more fear and it builds like a snowball. Once I have learned to be able to control, hey, you're not dying, then my anxiety and the fear of fear goes away.

[Pla. Dep. at 45]. Plaintiff testified, "I think that the definition of anxiety is fear. I·mean, it's what stems from it. So, fear is definitely a component of anxiety." [Pla. Dep. at 44]. Plaintiff's episodes of anxiety/panic attacks are unpredictable and unpreventable, and the most he can do is try to manage the attack by using various breathing techniques, pinching his thumb, and reassuring himself that he is not dying. [Pla. Dep. at 46–48, 78–82, 284; DSMF ¶ 67].

## III. ANALYSIS

■ The Americans with Disabilities Act Amendments Act of 2008 ("ADAAA"), 42 U.S.C. § 12101 *et seq.,* provides that employers may not "discriminate against a qualified individual on the basis of disability in regard to ... discharge of employees." 42 U.S.C. § 12112(a). To state a claim of disability discrimination, a plaintiff must prove the three elements of a *prima facie* case: (1) that he has a ·disability within the meaning of the ADAAA; (2) that, with or without reasonable accommodations, he can perform the essential functions of the job he holds; and (3) that he was discriminated against because of his disability. *Holly v. Clairson Indus., LLC,* 492 F.3d 1247, 1256 (11th Cir.2007). A plaintiff can prove he has a disability under prong (1) in three ways: he can show he has "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individu-

al; (B) a record of such impairment; or (C) [that he is] regarded as having such an impairment." 42 U.S.C. § 12102(1); *see also Rossbach v. City of Miami,* 371 F.3d 1354, 1357 (11th Cir.2004). Plaintiff here proceeds only under the third, "regarded as" prong.

### A. "Regarded as" Disabled

"The definition of disability [including under the 'regarded as' prong] shall be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter." 42 U.S.C. § 12102(4)(a). Under the ADAAA,

[a]n individual meets the requirement of 'being regarded as having such an impairment' if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment *whether or not the impairment limits or is perceived to limit a major life activity.*

42 U.S.C. § 12102(3)(a) (emphasis added). "In short, to qualify for coverage under the 'regarded as' prong, an individual is not subject to any functional test" and is not required to establish his employer's "beliefs concerning the severity of the impairment." *Interpretive Guidance on Title I of the Americans with Disabilities Act,* 29 C.F.R.App. § 1630.2(*l* ). To defeat summary judgment on this element, Plaintiff is "only required to raise a genuine issue of material fact about whether [his employer] regarded him as having a mental or physical impairment." *Hilton v. Wright,* 673 F.3d 120, 129 (2d Cir.2012).

The Magistrate Judge found that "Plaintiff has not presented evidence that Captain Tate, the decisionmaker, perceived that Plaintiff suffered from a mental impairment." (R & R at 25.) The Court

does not agree. The evidence, viewed in the light most favorable to Plaintiff, indicates that Tate perceived Plaintiff to suffer from a mental impairment and that Plaintiff was subjected to a prohibited action because of that perceived impairment.

To start, Tate directly said he was terminating Plaintiff because he had anxiety issues that Tate had investigated:

> I'm going to tell you I think you have anxiety issues because I've done a little investigating of my own and it's not the first time that that's happened. You had a situation that happened at the Academy that supposedly a thunderstorm came through [and] they had to call an ambulance for you. You've got some anxiety issues that you need to deal with.... It's not going to be here.

(Deposition of Eugene Tate Ex. 8.) This quote in itself is perhaps enough on its own to make it clear that the Captain regarded Plaintiff as suffering from serious anxiety issues that precluded his continued employment in the police force.

In addition, Tate had personally witnessed Plaintiff's anxiety and received reports from other officers regarding their observations of Plaintiff's manifestation of acute anxiety. While the underlying facts of each of the following events may be in dispute, the officers' perceptions and their reports to Tate are not. Sergeant Shoemaker reported to Tate that Plaintiff needed to be taken to the hospital during a thunderstorm while he was at the police academy. (Tate Dep. at 81:14–23.) Tate received a memorandum from Sergeant Adams that MPO Crawl had expressed to Adams that "Jordan was too scared to do the job. MPO Crawl advised that in several incidents Jordan showed extreme fear or verbalized being too afraid to do the wrong thing." (Declaration of Eugene Tate ¶ 6, Ex. C.) Tate received a letter from MPO Crawl the day before terminat-

ing Plaintiff which stated that "CRAWL highly recommends JORDAN to get counseling about his anxiety attacks." (Doc. 34–6 at 21.) Tate was aware that MPO Crawl had insisted Plaintiff see a medical officer at a fire station when Plaintiff appeared symptomatic. Finally, Tate witnessed firsthand physical evidence of Plaintiff's disabling anxiety attack during the Taser training Tate conducted. Of that incident, Tate said, "it was a lot more than I've ever seen any other student, as far as the apprehension level, being scared." (Tate Dep. at 40:810, Doc. 47 at 41.) At this stage, given these facts and the ADAAA's directive that "disability" be broadly construed in favor of coverage, Plaintiff has at the very least raised a genuine dispute of material fact about whether he was regarded as mentally disabled by the Defendant's critical decision-maker.

## B. Direct Evidence of Discrimination

■ In order to constitute direct evidence, Tate's statements must, "if believed, prove [the] existence of [the] fact in issue without inference or presumption. Evidence that only suggests discrimination or that is subject to more than one interpretation does not constitute direct evidence." *Taylor v. Runyon*, 175 F.3d 861, 867 (11th Cir.1999) (citing *Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1189 (11th Cir.1997)). "[R]emarks by non-decision-makers or remarks unrelated to the decisionmaking process itself are not direct evidence of discrimination." *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir.1998) (citing *E.E.O.C. v. Alton Packaging Corp.*, 901 F.2d 920, 924 (11th Cir.1990)).

■ The Magistrate Judge found this was not a direct evidence case because Captain Tate's statements about Plaintiff's

"anxiety issues" in the termination meeting do not rise to the level required to show direct evidence of discrimination. (R & R at 17 n. 2.) Plaintiff objects that they do. The Court agrees with Plaintiff that a reasonable jury could view Tate's statements as direct evidence of discriminatory intent or attitude under applicable Eleventh Circuit authority.

Captain Tate was the decisionmaker in this case. The transcript of Tate's conversation with Plaintiff immediately before Tate gave Plaintiff the option to resign or be terminated is quoted again here for convenience:

> TATE: I'm going to tell you I think you have anxiety issues because I've done a little investigating of my own and it's not the first time that that's happened. You had a situation that happened at the Academy that supposedly a thunderstorm came through [and] they had to call an ambulance for you. You've got some anxiety issues that you need to deal with.
>
> JORDAN: Ok.
>
> TATE: It's not going to be here.

(Doc. 47–1 at 2.) The Court has adopted the Magistrate Judge's finding that Plaintiff's anxiety issues were an impairment under the ADAAA. Tate's remarks here are crystal clear and constitute direct evidence of his discriminatory attitude based on his perception of Plaintiff's mental impairment. Put another way, this statement alone supplies "evidence from which a trier of fact could reasonably find that the defendant more probably than not discriminated against the plaintiff on the basis of a protected personal characteristic."

*Wright v. Southland Corp.,* 187 F.3d 1287, 1300 (11th Cir.1999).

The direct nature of the evidence is confirmed by an illustrative hypothetical used by the Eleventh Circuit in *Merritt,* 120 F.3d at 1190. In that Title VII retaliation case, the evidence at issue was the statement, "Your deposition was the most damning to Dillard's case, and you no longer have a place here at Dillard Paper Company." *Id.* The court substituted "Your deposition was the most damning to Dillard's case" with "You are black" and found there was no doubt that the evidence communicated cause and effect. *Id.* "You are black, and you no longer have a place here at Dillard's" was considered sufficiently direct evidence. The analogous substitution with the statement in this case results in: "You've got some black skin [anxiety issues] that you need to deal with.... It's not going to be here." As in *Merritt,* there is no doubt that this statement communicates cause and effect, confirming the direct nature of the evidence. The evidence of Captain Tate's statements "relate[s] to actions or statements of an employer reflecting a discriminatory ... attitude correlating to the discrimination ... complained of by the employee" and "will generally be sufficient evidence for a trier of fact to conclude more probably than not that the employment decision was based on improper discrimination." *Wright,* 187 F.3d at 1294. (citations omitted.) For this reason and the others discussed above, the Court finds the record contains direct evidence (1) indicating that Captain Tate regarded Plaintiff as having a mental disability and (2) that ties his discriminatory view of Plaintiff's disability to his termination decision or insistence that Plaintiff resign.[3]

---

**3.** This is an odd and difficult case due to the fact that the direct evidence of discriminatory attitude is inextricably intertwined with Captain Tate's legitimate concerns about Plain-tiff's performance of the job. Defendant here denies having regarded Plaintiff as having a mental impairment or having acted based on this perception. But Defendant cannot eat its

## C. Qualified Individual

The third and final element of Plaintiff's *prima facie* case requires a showing that he is qualified. A "qualified individual" is "an individual who ... can perform the *essential functions* of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8) (emphasis added).[4] "Essential functions" are "the fundamental job duties of the employment position," but do "not include the marginal functions of the position." 29 C.F.R. § 1630.2(n)(1); *see also Samson v. Fed. Exp. Corp.*, 746 F.3d 1196, 1200 (11th Cir.2014). Whether a person is qualified often turns on whether certain functions are essential and whether the person can perform those functions. "Determining whether an individual is 'qualified' for a job is ·a two-step process." *Reed v. Heil Co.*, 206 F.3d 1055, 1062 (11th Cir.2000); *see also Interpretive Guidance on Title I of the Americans with Disabilities Act*, 29 C.F.R.App. § 1630.2(m). The first step asks whether the individual satisfies the prerequisites for the position, including "sufficient experience and skills, an adequate educational background, or the appropriate licenses for the job." *Reed*, 206 F.3d at 1062. The second step asks whether the individual can perform the essential functions of the position. *Id.* Only the second step is at issue here.

After describing the proper standard[5] for determining whether a job function is essential, the Magistrate Judge correctly determined the relevant essential functions of Union City Police Officer. In doing so, the Magistrate Judge analyzed Union City's Patrol Officer job description, Plaintiff's impressions of the job's essential functions, the employer's judgment, and the Daily Observation Reports ("DORs") completed by Field Training Officers. (R & R at 30.) The Court adopts[6] the following R & R description of the relevant essential functions of a Union City Police Officer:

> The Union City Police Department has determined, and Plaintiff agrees, that it is essential for its officers to be able to "exercis[e] sound independent judgment in emergency or stressful situations" and "react quickly and calmly in emergencies." [Pla. Dep., Ex. 10 at 6; DSMF ¶¶ 64, 65; Doc. 40 at 7]. A police officer's ability to perform under stressful conditions is also listed as a "Critical Performance Task" on the DOR form. [Tate Dep., Ex. A; DSMF ¶ 63]. Captain Tate testified, "Critical Perform-

cake and have it, too. John Heywood, A Dialogue Conteinyng the Nomber in Effect of All the Prouerbes in the Englishe Tongue (1546) ("Wolde ye bothe eate your cake, and haue your cake?"). The undisputed evidence shows Tate considered Plaintiff's anxiety condition when terminating him. At this step in the analysis, Tate's verbalization of that consideration equates to direct evidence of discriminatory attitude.

4. Individuals who bring claims solely under the "regarded as" prong are not entitled to accommodation. *See Interpretive Guidance on Title I of the Americans with Disabilities Act*, 29 C.F.R.App. § 1630.2(*o*) ("Congress ultimately concluded that clarifying that individuals covered solely under the 'regarded as'

prong are not entitled to reasonable accommodations 'is an acceptable compromise given our strong expectation that such individuals would now be covered under the first prong of the definition [of disability], properly applied'.").

5. While the Magistrate Judge did not directly cite the factors for evaluating essential job factors contained in 29 C.F.R. § 1630.2(n)(2) and (3), many of those factors are included in the list that the R & R quotes from *Anderson v. Embarq/Sprint*, 379 Fed.Appx. 924, 927–28 (11th Cir.2010).

6. As noted above, no objections have been filed regarding the Magistrate Judge's determination of the relevant essential function.

ance Tasks include being able to perform the job under stressful conditions, which relates directly to officer safety issues. It is imperative that a trainee be able to perform the critical tasks in order to complete the FTO Program." [Tate Dec. ¶ 3].

(R & R at 30.) The job description also states that the work environment of a police officer "may require exposure to dangerous and life-threatening situations," and an officer "must be mentally and physically capable of using deadly force." (Tate Decl. Ex. E, Doc. 34–10 at 23.)

The Magistrate Judge found Plaintiff was not qualified to perform the essential functions of the police officer position. Plaintiff argues that the Magistrate Judge erred by recommending, as a matter of law, that Plaintiff was unqualified due to his inability to perform the duties of an officer when he experiences an anxiety episode. Plaintiff asserts that the facts relied upon are mostly Tate's subjective opinion, and, at any rate, are directly disputed by Plaintiff's competent evidence.

Plaintiff is incorrect. The vast majority of evidence the Magistrate Judge relied upon came from Plaintiff's own deposition. (See R & R at 29–32.) Much of this evidence establishes that Plaintiff's anxiety issues affected his ability to manage stress. (See R & R at 29 ("Plaintiff's anxiety condition impacts his ability to process and manage stress, and his condition can and has impacted his breathing, blood pressure, heart rate and adrenal fatigue. [Pla. Dep., Ex. 10 at 6; DSMF ¶¶ 65, 66]. Plaintiff's episodes are unpredictable and unpreventable. The most he can do is try to manage the attack by using various breathing techniques, pinching his thumb, and reassuring himself that he is not dying. [Pla. Dep. at 46–48, 78–82, 284; DSMF ¶ 67].").) The Magistrate Judge also relied on the memorandum from Sgt.

Adams expressing Crawl's concerns about Plaintiff's ability to do the job. (See id. at 31.) Plaintiff may—and does—dispute whether Crawl should have been concerned with Plaintiff's performance. But Plaintiff does not dispute that Crawl was concerned and that Crawl communicated this concern to Tate.

The Magistrate Judge does, however, rely on some evidence that is obviously disputed. For example, the Magistrate Judge relied on comments written in certain sections of FTO Heard's DORs. (Id. at 30.) However, FTO Heard's affidavit makes clear that he believed the command staff, including Captain Tate, did not consider comments made in those sections. (Declaration of Walker Heard ¶ 23, Doc. 40–12.) Heard made comments about Plaintiff in those sections solely for his own use and did not intend those comments to indicate anything to command staff about Plaintiff's job performance. (Id. ¶¶ 26–27.) Given this dispute about what FTO Heard thought he was communicating to Captain Tate about any major deficiencies in Plaintiff's performance, and Heard's overall glowing reviews of Plaintiff's performance, the Magistrate Judge may have given Heard's notations on the DORs as to certain incidents greater emphasis than warranted.

Heard and Grant's testimony is in part what makes the issue of qualifications difficult. Certainly, there is evidence demonstrating that Plaintiff lacked the capacity to perform some essential stress related functions of the police officer job in action. However, there is also some contradictory evidence as to his qualifications. He successfully completed police academy training and was hired by Union City. His first two FTOs, Grant and Heard, gave him positive reviews. In Heard's affidavit, he summed up his experience with Plaintiff by stating, "I thought he did a very good

job as a new police officer, and his DORs reflected that. I thought Mr. Jordan was going to be a good officer." (Heard Decl. ¶ 8.) FTO Heard also stated, "I was flabbergasted when I heard that Mr. Jordan had basically been forced out of UCPD by Captain Tate because Mr. Jordan had done a very good job when he rode and worked with me, and his other FTOs had said good things about his job performance." (*Id.* ¶ 29.) This evidence of Plaintiff's capacity and qualification has some persuasive value.

However, it is apparent that there were essentially two phases of training that occurred here: an initial phase with FTOs Heard and Grant, and the next phase, starting with FTO Crawl, where more stressful law enforcement work was required during night duty. While Plaintiff demonstrated a clear threshold level of qualification during the first phase of his training, the next phase proved too burdensome or difficult. At that point, as explained below, Captain Tate and others felt that Jordan placed himself, other officers, and members of the public at risk.

This heightening of performance qualification requirements during Plaintiff's training is analogous to the shift in conditions that occurred in *Holbrook v. City of Alpharetta, Georgia,* 112 F.3d 1522 (11th Cir.1997). In that case, however, it was not the training and performance functions that changed, but the individual's ability to continue performing the essential functions of the job. Holbrook, a detective, got in a car accident and was rendered unable to drive or collect certain types of evidence due to a visual impairment. *Id.* at 1525. Holbrook argued that his disability would only very infrequently impact his ability to do his job because crimes that would implicate those disabilities almost never happen in Alpharetta. Judge Birch explained that, even so, "being prepared to respond

to unexpected events is, in part, precisely what defines a police officer or detective." *Id.* at 1528. The Court held that even though those particular crimes had not occurred often in the past and may occur only infrequently in the future, Holbrook's inability to perform those essential functions was enough to render him unqualified. *Id.*

In *Holbrook,* the essential functions remained the same and the detective changed in his abilities. Here, Plaintiff's abilities appear to have remained the same, but the full spectrum of performance capabilities required by the essential functions of a Union City police officer became more pronounced in the second phase of training. The training changed from covering the less stressful "morning watch" with FTOs Heard and Grant to handling the more aggressive police work conducted by FTO Crawl during night duty. As in *Holbrook,* the Court is persuaded that Plaintiff may have been qualified at the outset, but his incapacity to perform the essential functions of the job became more apparent during the second phase.

In addition, the Court finds *Richey v. City of Lilburn* revealing with regard to Plaintiff's temporary inability to handle high-stress situations while attempting to mitigate the effects of an anxiety attack. 127 F.Supp.2d 1250 (N.D.Ga.1999). In *Richey,* the court granted summary judgment for defendant on an ADA claim involving a police dispatcher who suffered from reoccurring seizures. These seizures were unpredictable and lasted thirty seconds to three minutes. *Id.* at 1262. The essential functions in *Richey* were very similar to those here. Dispatchers were "expected to exercise independent and sound judgement [sic] in handling emergency situations" and to have the "ability to act calmly and with accuracy in an

emergency." *Id.* at 1263. The court held that "[a]lthough plaintiff may be fully capable of performing her duties most of the time, her inability to react or communicate coherently during a [seizure] poses a direct threat to police officers and to the general public seeking emergency assistance through the 911 service." *Id.* The court also found her seizures posed "a direct threat to plaintiff's ability to perform these essential functions of the job." *Id.* at 1264.

 While the Court does not believe the direct threat defense can be established here due to the lack of a sufficient individualized assessment of Plaintiff's disability on the part of the Defendant,[7] it does find *Richey* persuasive with regard to Plaintiff's lack of qualification to perform the essential functions of the job. Both cases involve unpredictable, unpreventable, uncontrollable,[8] temporary attacks. And both cases involve police officers who are required to respond to emergency situations in a cool, calm, collected manner.

While seizures may be more debilitating than Plaintiff's anxiety attacks, the significance of Plaintiff's ability to perform the essential functions of his job as a police officer is magnified by the fact that he was not merely a dispatcher who directs officers to emergencies or a detective who drives to the scene to collect evidence after the crime is complete. Plaintiff was a first responder. He was the type of officer whose job it was to respond to emergencies and put himself in harm's way to protect and serve the public. Plaintiff's limitations in his ability to perform the essential functions of his job, therefore, pose at very least the same serious problems as those described in *Holbrook* and *Richey*. Stated more directly, "the risk of an armed patrol officer being unable to function in an emergency situation is not a risk we are prepared to force a police department to accept. The inherent and substantial risk of serious harm arising from such episodes, given the nature of police work, is self-evident." *Burroughs v. City of Springfield*, 163 F.3d 505, 508 (8th Cir.1998).

7. The Magistrate Judge found that even if Plaintiff were qualified, Defendant would be entitled to summary judgment due to the "direct threat" defense. (R & R at 33 n. 7.) The direct threat defense requires a degree of individualized assessment that is lacking here. "In determining whether an individual would pose a direct threat, the factors to be considered include: (1) The duration of the risk; (2) The nature and severity of the potential harm; (3) The likelihood that the potential harm will occur; and (4) The imminence of the potential harm." 29 C.F.R. § 1630.2(r); *see also Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 86, 122 S.Ct. 2045, 153 L.Ed.2d 82 (2002) (quoting 29 C.F.R. § 1630.2(r)). There is a smattering of evidence that Captain Tate considered some of these factors, but evidence is lacking that he considered all of them or that he considered any actual medical or comparable objective information concerning Plaintiff's disability in connection with his decision to terminate Plaintiff. Even assuming *arguendo* that Captain Tate believed Plaintiff was "a

significant risk to the health or safety of others that [could] not be eliminated by reasonable accommodation," 42 U.S.C. § 12111(3), that belief is not enough under the direct threat doctrine absent a full objective assessment. "[A] good-faith belief that a significant risk of harm exists is insufficient [to establish the direct threat defense] if it is not grounded in medical or other objective, scientific evidence." *Lowe v. Alabama Power Co.*, 244 F.3d 1305, 1308 (11th Cir.2001) (citing *Bragdon v. Abbott*, 524 U.S. 624, 649, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998)). As a sufficient individualized assessment of Plaintiff's disability based on medical evaluation or comparable objective information was not performed here, Union City cannot avail itself of the direct threat defense.

8. As Mr. Jordan stated during his deposition, "Don't get me wrong, I can't control the feeling. I can't control the anxiety." (Deposition of Jason Jordan at 47:24–25, Doc. 34–3 at 8.)

Accordingly, although there is evidence that Plaintiff may have been qualified to perform the essential functions required during the first phase of his training, the Court finds that Plaintiff has not established a viable jury question regarding whether he could handle the core functions and capacity to handle stress required of a police officer once he moved into the second phase of his training. In short, Plaintiff has failed to show he was otherwise qualified for the police officer position.

However, even if the Court were to find that Plaintiff presented sufficient evidence to establish his qualifications based on his handling of the first phase of the training combined with his factual challenge of the officers' descriptions of incidents occurring on November 14th and during Taser training, summary judgment is still warranted based on Defendant's compelling rebuttal evidence.

### D. Defendant's Rebuttal

■ Assuming *arguendo* Plaintiff presented evidence sufficient to survive summary judgment based on his *prima facie* case, the question becomes whether Defendant has presented enough evidence to warrant summary judgment based on its rebuttal. In a direct evidence case, "the *McDonnell Douglas* test is inapplicable." *Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 121, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985); *see also Wright,* 187 F.3d at 1293. Rather:

> When a prima facie case is established by direct evidence, a defendant's rebuttal burden is heavier than it would be under a *McDonnell Douglas* prima facie case: ... defendant can rebut only by proving by a preponderance of the evidence that the same decision would have been reached even absent the presence of that [discriminatory] factor.

*Buckley v. Hosp. Corp. of Am.,* 758 F.2d 1525, 1529–30 (11th Cir.1985) (quotation omitted).

■ Defendant has presented sufficient evidence to meet this heavier standard of proof. In particular, Defendant has provided persuasive evidence that Plaintiff was unable to perform essential functions when he was required as part of advanced training to perform in high stress law enforcement contexts.

As discussed above, Plaintiff is correct that the "record evidence" cited by the Magistrate Judge to support lack of qualification was not always undisputed. The Court need not go through each and every piece of evidence cited because ample facts are not in dispute. The most compelling of those undisputed facts, some of which have already been quoted above, directly implicate Plaintiff's anxiety disorder and its effects on his ability to manage stress and react in stressful situations. Plaintiff admitted the following in materials filed in the record assembled in connection with Defendant's Motion for Summary Judgment, as accurately set forth in the R & R:

> Plaintiff has been diagnosed with generalized anxiety disorder, cyclothymic disorder, and panic disorder, and he has had several situations where he has experienced heightened anxiety since 2007. [Pla. Dec. ¶ 2]. Plaintiff's anxiety episodes occur up to several times a month, and prior to his employment with Union City, he received medical treatment for his anxiety attacks on at least four occasions, including while he was in the police academy. [Pla. Dep. at 70–72, 82, 86, 117, 278; DSMF ¶¶ 73, 75]. *Plaintiff's anxiety condition impacts his ability to process and manage stress, and his condition can and has impacted his breathing, blood pressure, heart rate and adrenal fatigue.* [Pla. Dep., Ex. 10 at 6; DSMF ¶¶ 65, 66]. *Plaintiff's epi-*

*sodes are unpredictable and unprevent-able.* The most he can do is try to manage the attack by using various breathing techniques, pinching his thumb, and reassuring himself that he is not dying. [Pla. Dep. at 46–48, 78–82, 284; DSMF ¶ 67].

(R & R at 29 (emphasis added).) Plaintiff also reported that his anxiety limits his day-to-day activities "in the fact that I have to remember to breath [sic] and I have to focus on trying to do this." (Deposition of Jason Jordan at 286:2–8, Doc. 34–3 at 70.) Lastly, Plaintiff also stated that his anxiety attacks are uncontrollable. (*Id.* at 47:24–25 ("Don't get me wrong, I can't control the feeling. I can't control the anxiety.").)

This is not a matter of weighing credibility, which the Court does not do at this stage. *See Hairston v. Gainesville Sun Publ'g Co.,* 9 F.3d 913, 919 (11th Cir.1993), *reh'g denied,* 16 F.3d 1233 (11th Cir.1994) (en banc). The statements above are Plaintiff's, not Captain Tate's or any other Union City officers'. And these statements, even when viewed in the light most favorable to Plaintiff, support Defendant's argument that Plaintiff's employment was ended for a legitimate reason that had nothing to do with a discriminatory animus. As Captain Tate stated in his declaration submitted in conjunction with the Motion for Summary Judgment:

> Based on the culmination of events up to that point ... I concluded that Mr. Jordan was failing to meet the expectations of the working test and, in particular, that he was too afraid to do the job. I did not believe at that point that additional training would give Mr. Jordan the courage to engage on a call and effectively perform the duties of a City police officer. I also believed that placing him back on the street would pose an undue risk of harm to himself (if he

were to have another medical emergency while he was responding to or on the scene of an emergency), other officers (if he failed to protect them from harm), and members of the public (if he was unable to render emergency assistance and protect them from danger). The risk of harm that could have resulted by placing Mr. Jordan back into the field to continue in the training program was not a risk I was willing to take. I simply could not, in good faith, put another officer or the public at risk in the event Mr. Jordan were to have had another incident where he failed to act.

(Tate Decl. ¶ 12, Doc. 34–9 at 8.)

This statement, particularly when coupled with the undisputed evidence of the effects of Plaintiff's condition, demonstrates that Captain Tate had legitimate reasons to terminate Plaintiff and that Plaintiff would have been terminated absent any discriminatory intent. It also demonstrates that Captain Tate's concerns about Plaintiff's qualifications were justly amplified due to the law enforcement context in which the employment decision was made. Plaintiff has submitted no evidence that effectively counters or rebuts this showing or creates a jury question.

Having reviewed the record in its entirety, the Court finds Defendant has proven by a preponderance of the evidence that Plaintiff would have been terminated "even absent the presence" of any discriminatory factor. *Buckley,* 758 F.2d at 1530.

## IV. CONCLUSION

For the foregoing reasons, the Magistrate Judge's R & R [Doc. 52] is **ADOPTED IN PART** and Plaintiff's Objections thereto [Doc. 56] are **SUSTAINED IN PART** as stated herein. Defendant's Motion for Summary Judgment [Doc. 34] is **GRANTED.** Plaintiff's claims

are **DISMISSED.** The Clerk is **DIRECT-ED** to close the case.